## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## FORT WAYNE DIVISION

| | | |
|---|---|---|
| ESTATE OF RUDY ESCOBEDO | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:05-CV-424-TS |
| | ) | |
| CITY OF FORT WAYNE, et al., | ) | |
| Defendants. | ) | |

### OPINION and ORDER

This is a civil rights lawsuit against the City of Fort Wayne and members of the Fort

Wayne Police Department under 42 U.S.C. § 1983 for violations of constitutional rights and

under Indiana Code § 34-23-1-2, the Indiana Tort Claims Act (ITCA), for wrongful death. The

Plaintiff, Raquel Hanic, the personal representative of the estate of Rudy Escobedo, alleges that

the Defendants used excessive force and committed other constitutional violations against

Escobedo during a July 19, 2005, standoff that ended when police fatally shot Escobedo in his

apartment.

### BACKGROUND

On December 20, 2005, the Plaintiff filed a complaint [DE 1] naming the City of Fort

Wayne and certain members of the Fort Wayne Police Department, in their individual capacities,

as Defendants: Martin Bender, Douglas Lucker, Kevin Hunter, Kevin Zelt, Brian Martin, Jason

Brown, Scott Straub, Bernard Ebetino, Derrick Westfield, Shane Lee, and Tim Selvia. On

January 26, 2006, the Defendants answered the complaint [DE 13]. On January 16, 2007, the

Plaintiff moved [DE 34] to dismiss Defendants Lee and Westfield from the case, and on January

22, 2007, the Court granted [DE 40] the motion. Also on January 16, 2007, the Defendants filed

a motion for summary judgment [DE 37] along with thirty-one attachments. On March 22, 2007, the Plaintiff filed a Response [DE 49] and designated as evidence seventy-five attachments. On June 29, 2007, the Defendants filed their Reply [DE 72].

On the same date, the Defendants filed a motion to strike the affidavit of Larry Danaher [DE 73], the Plaintiff's expert witness, to preclude the Court from considering it when analyzing the summary judgment motion. On July 20, 2007, the Plaintiff filed a Response [DE 82] to that motion.

On July 20, 2007, the Plaintiff filed a Surreply [DE 83] to the motion for summary judgment with three attachments. On July 31, 2007, the Defendants filed a Response [DE 88] to the Plaintiff's Surreply, attaching two affidavits.

On January 31, 2008, the Court held a telephone conference [DE 97] with the parties and advised them that it would deny the Defendants' motion to strike the affidavit of Danaher. On March 7, 2008, the Court issued an opinion and order [DE 100] denying the Defendants' motion to strike.

## SUMMARY JUDGMENT STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that

party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex*, 477 U.S. at 323. In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc*., 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp*., 200 F.3d 485, 492 (7th Cir. 2000). However, "[i]nferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004). The court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp*., 168 F.3d 998, 1009 (7th Cir. 1999); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)

(noting often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Pursuant to local rule, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).

## MATERIAL FACTS

Construing all facts in a light most favorable to the Plaintiff, and drawing all legitimate inferences in favor of the Plaintiff, the following facts are assumed true for the purposes of summary judgment

### A.      Background Information About the Defendants

Because the Plaintiff named a large number of Defendants in this lawsuit and because many members of the police department were involved with the incident but are not named as Defendants, it is necessary to set forth the positions and roles of Defendants and other members of the Fort Wayne Police Department.

The commander in charge of the scene was Deputy Chief Martin Bender, who was located at the mobile tactical operations center at the northwest corner of Berry Street and Fairfield Avenue. (Bender Dep. 37:21–38:13, DE 51-12.) Deputy Chief Douglas Lucker also

was present at the scene on two occasions. Chief of Police Russell York was at the scene for a short time but then left for police headquarters.

Next in the line of command were Sergeant Kevin Hunter, head of the Crisis Response Team (CRT), or the negotiators, and Lieutenant Kevin Zelt, head of the Emergency Response Team (ERT), or the tactical officers, commonly referred to as a SWAT team.

The CRT is a unit of six to ten officers who function as negotiators during standoffs with suspects. (Zelt Dep. 26:24–27:11, DE 51-19.) CRT works in conjunction with ERT during these situations. (*Id.* at 26:20–223.) In this case, Officer Bernard Ebetino was the negotiator; Officer Lorna Russell served as his coach; Officer Sofia Rosales (as well as Detective Jonathan Bowers at different times) recorded a timeline of events; and Officer Victor Torres (as well as Bowers at different times) relayed information to the CRT commander, Hunter. (Ebetino Dep. 47:10–19, 48:5–24, 83:7–23, DE 51-21; Hunter 1st Dep. 60:1–22, DE 51-20.)

The ERT was composed of: Officer Brian Martin, Officer Jason Brown, Officer Scott Straub, Sergeant Tim Selvia, Officer Derrick Westfield, Sergeant Shane Lee, Sergeant Jonathan Noll, Sergeant Scott Caudill, Officer Juan Barrientes, Officer Aaron Demeritt, Officer Albert Davis, and others. (Def. Ans. to Pl. Interrog. No. 21, DE 56-2 at 24.)

The ERT members formed different units and performed different functions. Martin, Davis, and Barrientes fired the tear gas rounds into Escobedo's apartment. (Def. Ans. to Pl. Interrog. No. 34 at 2, DE 56-4.) The team that entered Escobedo's apartment was led by Selvia and also included Martin, Brown, Straub, Westfield, and Lee. (Selvia Dep. 65:3–9, DE 51-10.)

Demeritt and Noll paired up to serve as observers and sharpshooters outside the apartment building. (Demeritt Rpt.1, DE 53-2; Noll Rpt. 1, DE 53-5.) Caudill also served as an

5

observer and sharpshooter, positioning himself on the west side of the building. (Caudill Rpt. 1, DE 53-7.)  A number of other officers established and manned the outer perimeter, dealt with traffic issues, or handled other matters that are not materially relevant to the motion for summary judgment.

**B.    Escobedo's 911 Call**

This incident began with Escobedo seeking the help of authorities. On July 19, 2005, at 4:24 a.m., he dialed 911. Escobedo told the dispatcher that he was armed with a gun, would shoot himself, believed police were just outside or even in his apartment, and feared police would shoot him. He also told the dispatcher that he had recently begun using drugs again, he was high on cocaine at the moment, and he was taking Antabuse for his alcohol problem. On a few occasions during the call, it appears Escobedo was delusional because he addressed officers that he (incorrectly) believed were in his apartment. "Get out of my house. I'm gonna shoot myself you guys." (911 Call Tr. 7; DE 37-28). Near the end of the call, he said that members of a task force or the SWAT team were in his apartment.

Escobedo asked the dispatcher to call James Cates, a psychologist from whom Escobedo had received counseling services over the course of several years ending in December 2004 or January 2005 (Cates Dep. 54:2–4, DE 51-3; Hunter Rpt. 1; DE 53-4), and he provided a phone number for Cates. At several points Escobedo made clear that he was seeking help: "I just want help." (911 Call Tr.  4.) "Please let them talk. Please let me talk to someone. . . . I want to talk to someone on the phone, but I'm, I'm hiding right now cause they're, they're all over the windows." (*Id.* at 10.)

While Escobedo threatened to commit suicide many times, he also expressed a fear of being killed by police. Escobedo never made any explicit threats toward police or other persons, besides himself, during this call. "I don't want to get shot either. I'm not going to shoot them." (*Id.* at 2). "I swear to God, if they shoot me, I'm gonna kill myself. I'm not gonna hurt anybody. I just want help." (*Id.* at 4.) "I swear to God if they come in here. I'm not gonna . . . And I'm not gonna kill them or shoot them. I don't want to die." (*Id.* at 5.) "I don't want to have a gunfight with a cop. I respect the police." (*Id.* at 9.) "I do not want to get killed by a cop." (*Id.* at 11.)

The overall tone of the call indicates that Escobedo was in despair about his drug addiction and his life in general, and that he was suicidal. "I want to die right now because I'm a drug addict." (*Id.* at 6.)  "Why am I doing this to myself right now? This is, I'm over. My life is over. When they shoot me. . . . It's stupid for them to come in here cause I am gonna shoot myself. I don't want to hurt anybody." (*Id.* at 8–9.) "I don't want to hurt anybody. I would never hurt anybody other than myself. I don't want to get shot by a cop, but I will kill myself because I don't want to live." (*Id.* at 9.)

Escobedo's apartment was on the seventh floor of an apartment building at 530 West Berry Street. The block is bordered by Fairfield Avenue and Fulton Street, running north and south, and West Main Street on the north side of the block. Escobedo's apartment windows faced west toward Fulton Street. (Bender Dep. 55:22–56:7.)


**C.     Initial Response**

Sergeant C.M. Taylor was the first officer to speak with Escobedo, though two other officers (Craig Fairchild and Jeffrey Foust) had arrived first and established a perimeter around

his apartment door on the seventh floor. Fairchild brought a shotgun loaded with beanbag rounds. Foust told dispatch and Taylor that, when he knocked on Escobedo's door, he heard what he thought to be the sound of a bullet being chambered into a handgun. (Taylor Dep. 15:20–16:3, DE 51-18.)

Taylor obtained Escobedo's number from the dispatch center and called Escobedo at about 4:55 a.m., shortly after Escobedo's call with dispatch had ended. Taylor used his personal cellular phone to make the call. Escobedo told Taylor that he was armed and planned to commit suicide. (*Id.* at 21:20–22.) Escobedo continued to make statements of the sort he had made to the dispatcher. (*Id.* at 19:21–23, 21:1–6.) Taylor said that Escobedo "appeared to be irrational and delusional." (*Id.* at 21:10–11.) Escobedo again mentioned Cates, but did not specifically request to speak with Cates. (*Id.* at 22:20–23:4.) The dispatch center called an office number for Cates and left a message because Cates could be a source of information for police. (*Id.* at 23:4–10.) Taylor believed that Escobedo was moving objects inside his apartment. (*Id.* at 20:10–12.) After about twenty or twenty-five minutes, Taylor decided that CRT and ERT should respond to the situation and he asked another sergeant at the scene to make the request. (*Id.* at 27:15–28:11.) Taylor continued to speak with Escobedo, who gave the same type of responses as he had earlier. Taylor testified in his deposition that he did not recall Escobedo making any statements that were threats against the public or the police. (*Id.* at 38:21–39:6.)

Over the next hour and a half, members of the CRT and ERT began arriving on the seventh flooor. Taylor began the process of transferring the phone call to Ebetino, the negotiator for CRT. Taylor briefed Ebetino about the situation, including the fact that Escobedo was armed. Taylor also spoke with Bowers and Rosales of CRT about Cates. He also spoke with Selvia of

the EST. After that, Taylor reported to the incident command center and told Bender and Hunter that he was unable to communicate effectively with Escobedo. He later left the scene and typed his report.

### D.    Ebetino's Negotiations and the CRT

Ebetino took over negotiations with Escobedo at about 5:42 a.m. and continued to use Taylor's personal cellular phone. Escobedo repeated that he was suicidal and armed. He also asked to speak with Cates and said he wanted help and medicine for his drug addiction. (Ebetino Rpt. 1; DE 53-3.)

Rosales recorded the timeline of events, Russell coached Ebetino, and Torres relayed information to the command post by radio. (Ebetino Dep. 47:10–48:9.) Bowers spent some time recording the timeline and also participated in relaying information. (Hunter 1st Dep. 60:9–19.) At approximately 6:23 a.m., the CRT began using a "direct link phone system," a device that allowed several other officers on the seventh floor to listen to the conversation between Escobedo and Ebetino. (Ebetino Dep. 63:14–64:1; Ebetino Rpt. 1.) The device does not record the conversation. (Ebetino Dep. 62:16–17.)

When the switch was made to the direct phone link system, Ebetino also stopped using Taylor's cellular phone because it was running low on batteries. Ebetino began using Rosales's personal cellular phone. (Ebetino Affid. 2, DE 88-2; Rosales Affid. 2; DE 88-3.)[1] No police

---

[1] The fact that Ebetino switched from Taylor's cellular phone to Rosales's is not reflected in Ebetino's written report, written on July 19, 2005, after the incident ended, or made explicit in his deposition, which occurred in 2006. Ebetino made the signed, sworn affidavit on July 27, 2007, which is several weeks after the Plaintiff in her July 20, 2007, Surreply [DE 83] raised the issue that Escobedo attempted to reestablish contact with police by calling Taylor's cellular phone number after tear gas rounds were fired into his apartment and before officers entered his apartment. There is no deposition of or statement by Rosales in the record other than her July 26, 2007, affidavit.

officer used Taylor's cellular phone during the rest of the incident. (*Id.*) It is not clear what Ebetino did with Taylor's phone or whether the phone ran out of power. There is no evidence in the record that Escobedo was told of the change in phones or given the new phone number in case the call was terminated.

Escobedo's comments to Ebetino continued to include threats of suicide and a fear of being killed by police. (Ebetino Dep. 67:11–15.) At times, the conversation took a positive turn, (*e.g.*, Ebetino Dep. 111:2–16, 107:22–108:1), and Ebetino believed Escobedo was close to surrendering (*id.* at 78:17–22). But Escobedo would always return to comments about suicide, fear of being killed by police, and his addictions. "I believe that there were times I thought we were making real progress and that we'd be done soon and he'd be coming out and then all of a sudden he would say something to lead me to believe that he had no intention of coming out any time soon." (*Id.*).

At one point, Ebetino told Escobedo that police were trying to contact Cates and bring him to the scene so that Escobedo could speak to him when he left his apartment. (Ebetino Dep. 70:14–20.) Hunter eventually spoke with Cates by phone shortly after 8 a.m. Hunter did not invite Cates to come to the scene. (Hunter 1st Dep. at 89:3–5.) Hunter was unsure if he relayed to Cates Escobedo's request to speak with Cates (*Id.* at 88:4–6). Hunter recalled that Cates said it would be difficult to deal with Escobedo if he was under the influence of drugs and alcohol, (Hunter Rpt. 1, DE 53-4; Hunter 1st Dep. 89:6–90:2), and also that Cates did not think Escobedo had a history of using weapons or attempting suicide. (Hunter Rpt. 1).

---

A timeline log entry for 6:23 a.m. only indicates that a "throw phone," a communication device that police will insert into a structure for a subject to use, was in use at that time. (*See* DE 88-2 at 6.) It does not state that police switched from Taylor's phone to Rosales's.

Throughout the conversation, Escobedo often left the phone for a period of time but did not end the call. (Ebetino Dep. 93:22.) Ebetino asked Escobedo to leave his apartment unarmed, asked him about his problems, told him that Ebetino wanted to help, and asked him not to shoot himself. (*Id.* at 77–80.)  Ebetino did not believe that Escobedo made or constituted a threat to the police or to the public, (*id.* at 117:12–16), except "the only indication . . . was when he said that he wanted to come out of the apartment with the gun." (*Id.* at 137:9–12.) This statement occurred at 8:28 a.m., (*id.* at 118:5–14), which was after supervisors had decided at about 8 a.m. to fire tear gas into the apartment and then enter the apartment (Bender Dep. 69:17–70:19).

Ebetino believed sounds from the apartment, as well as Escobedo's comments, indicated that Escobedo was barricading the door with furniture. (Ebetino Dep. 93:8–19.) At other times, it sounded as if Escobedo was removing the barricade by the door. (*Id.* at 107:18–23.) At 7:27 a.m., Ebetino heard what he believed was Escobedo removing the barricade from the door. (*Id.* at 107:18–24.)  Ebetino assumed this information was conveyed to the commanders. (*Id.* at 108:2–12) At this point, Ebetino believed he was making progress with Escobedo.

At 7:38 a.m., Escobedo said he wanted to speak to his sister, (*id.* at 110:12–18) and later that he wanted her to meet him at Parkview Hospital, which Ebetino interpreted as a positive sign (*id.* at 111:2–16). At 7:51 a.m., Escobedo told Ebetino he was moving objects away from his door, but Ebetino was unsure of what Escobedo was really doing. (*Id.* at 114:1–16.)

Escobedo's comments and responses were ambiguous. At some point in the final hour of negotiations, Escobedo "told me that he was sorry and that he hated to cause me so much trouble because he liked me." (*Id.* at 129:22–24, Ebetino Rpt. 1.) Ebetino called that "a bad sign," (Ebetino Dep. 130:12–14), but Escobedo also made comments later that "were more

encouraging." (*Id.* at 130:21–22.) Despite some of the positive signs from Escobedo, Ebetino did

not have much confidence in Escobedo's mental state. "I was under no impression that he was

becoming more rational. At best, I thought he wasn't getting worse." (*Id.* at 115:24–116:2). "The

longer we went on, the less confident I was of [Escobedo coming out of the apartment]." (*Id.* at

153:21–22.)


E.      **Discussion of Tactical Response**

        While Ebetino negotiated with Escobedo, Hunter, Zelt, and Bender discussed their

options. Accounts differ about when the police first mentioned and discussed the idea of using

tear gas against Escobedo. Ebetino stated that at 6:45 a.m. he "was informed that EST was

considering introducing gas to try and have him retreat from the apartment and come out to us,

but we were still carrying on our conversations." (Ebetino Dep. 100:17–20.) Hunter's after

action report for the CRT said Zelt mentioned the idea later, at approximately 8 a.m. (CRT After

Action Rpt. 2, DE 56-10.) Bender also recalled first discussing the idea tear gas and entry at

around 8 a.m. (Bender Dep. 69:17–70:19.)

        Bender had overall authority over the incident and the scene (Bender Dep. 46:23–47:2)

but relied on Zelt to "choose the tactics" against Escobedo and on Hunter for information about

negotiations. (*Id.* at 52:2–11.) Hunter relayed Escobedo's changing attitudes about surrendering

and then threatening suicide to Bender. (*Id.* at 52:2–11.) Bender admitted that he "never heard

anything that it was getting to the point where it was becoming worthless to negotiate with him."

(*Id.* at 52:8–11.)

        However, Bender said the key factor in his decision to take action against Escobedo was

12

that by 8 a.m., after consulting with Lucker, Zelt, and Hunter, "it was our belief that the negotiations were not going anywhere." (Bender Dep. 69:16–24.) Bender said that Hunter "felt that the negotiation process was not going well and was pretty much at a dead end." (*Id.* at 120:5–8.) Bender said he was told that Escobedo would at times hang up the phone and then take a call from police after 10 or 15 minutes. (*Id.* at 120:15–19.) "Basically, the input that I was receiving is that he was not willing to talk anymore." (*Id.* at 120:20–21.)

Bender said pedestrian and vehicle traffic was increasing and "we were starting to develop a scene that was being chaotic, as far as being able to control the pedestrian and motor vehicle traffic." (Bender Dep. 69:24–70:4.) Bender was told by Hunter that Ebetino heard noises suggesting that Escobedo was barricading and/or fortifying his apartment, which also warranted the force. (*Id.* at 71:4–10.) Bender said he did not remember knowing or learning that Escobedo was afraid of the police and that Escobedo said he would not hurt or shoot the police. (*Id.* at 42:4–11.)

But later Bender also said Escobedo was a threat to the public because of "the mere fact that he was armed with a weapon and threatening to commit suicide, he was a threat to himself and if, you know, he wanted to commit suicide or have us do it for him, if he was to start opening fire out the window at other civilians who may have been on the street, that would have constituted an emergency." (*Id.* at 98:24–99:15.) Bender said officers were at risk because Escobedo "could have shot through the door at an officer . . . . He could have shot out the window and wounded or killed an officer, and the same thing for the general public. (*Id.* at 109:17–21.)

Hunter, as the leader of the CRT, was passing along information about the negotiations to

13

Zelt and Bender. (Hunter Dep. 76:11–22.) Hunter had to rely on information from Bowers and Torres. (*Id.* at 60:12–19.) Normal procedures call for Hunter, as the CRT leader at the scene, to listen to negotiations via the direct link system, but he did not do so. (*Id.* at 84:8–20.) As a result, Hunter did not always learn about important information and accordingly could not inform Zelt and Bender about it. For example, Hunter said he did not recall hearing or learning that Escobedo had removed objects from his apartment door, something that would have been considered a sign of progress. (*Id.* at 85:3–11.)

In essence, Hunter was told and then relayed that negotiators were not making progress with Escobedo. "During the negotiation process . . . , I was kept informed by Detective Bowers of the progress or lack of in this situation." (CRT After Action Rpt. 2; Hunter 1st Dep. 74:12–77:2; Hunter Rpt. 1.)  Hunter said he was unsure if he relayed the information he received from Cates to Zelt and Bender, but admitted that the information would have been important. (Hunter 1st Dep. 90:9–21.)

Zelt first proposed using chemical agents or gas against Escobedo. (Zelt Dep. 102:11–13.) That use of force "is standard procedure" and "the next logical step" when communications or negotiations with a person are not succeeding. (*Id.* at 102:19–103:6.) Zelt said one key piece of information he received from Ebetino that was significant to his decision to advocate the use of chemical agents or gas was that Ebetino "could hear Mr. Escobedo barricading and fortifying his position." (*Id.* at 104:4–5.)

Zelt also said he believed Escobedo had made threats of some kind, but it is not clear if Zelt believed this at the time of the incident or formed that opinion afterwards. "I had information that was relayed to me that he had made what we would consider some veiled

14

threats of some type, possibly, and some direct ones." (*Id.* at 89:8–11.) Zelt said one example of

such a threat was Escobedo's statement that he would leave his apartment but bring his gun with

him. "[T]hat would seem to be a veiled threat of some type, some type of intent." (*Id.* at

89:13–17.) That statement was made at 8:28 a.m. (Ebetino Dep. 118:5–14.) However, when Zelt

was pressed about the matter in a deposition, he could not identify any statement Escobedo made

that Zelt knew of at the time that constituted an explicit threat to the police or public. (Zelt Dep.

at 91:10–92.)

Zelt stated that, in reviewing the 911 transcript and other materials after the standoff, he

interpreted one comment Escobedo made during the 911 call to be a threat against the police.

(Zelt Dep. 92:6–8.) Zelt admitted that he did not know about this statement until after the

standoff. (*Id.* at 92:19–93:2). Escobedo's statement was: "If they come in here, I'm shooting

. . . I'm, I'm gonna kill myself." (911 Tr. 5) (ellipsis in original). Zelt said that statement "could

very well mean" that Escobedo would shoot the police if they entered his apartment. (Zelt Dep.

93:14.) Zelt continued:

> I have to interpret it that way. . . . Because if I am responsible for the safety of my
> people, then I have to assume the worst. . . . . "If they come in here, I'm shooting,"
> he is referring to us. . . . We have no idea of knowing exactly what was on his
> mind when he said that, but, I take that statement to be a threat.

(Zelt Dep. 93:17–94:1.) Additionally, Zelt said Escobedo had committed the felony crimes of

possessing cocaine and being a convicted felon in possession of a firearm, (*id.* at 142:9–19), but

the evidence in the record does not establish that Zelt knew of the latter crime during the

standoff. Zelt also said "a good case could be made for . . . criminal recklessness." (*Id.* at

142:21–23.) But he acknowledged that the purpose was not to arrest Escobedo but to take him

into custody for a 24-hour emergency mental health detention. (*Id.* at 143:21–23.)

15

Other factors that led Zelt to advocate the use of tear gas were that police had given

Escobedo sufficient opportunity to surrender but there were no indications that he would

surrender, and that the readiness of the tactical officers at the scene was deteriorating (Zelt Dep.

149:19–150:15.) Zelt said July 19, 2005, "was a very hot day," and officers were wearing long

pants and sleeves along with body armor and other protective gear. (*Id.* at 149:20–150:3.)

> An individual can only function, in that environment, for so long before their readiness
> starts to deteriorate. Let's keep in mind that, in this case, the suspect was in air
> conditioned comfort. His readiness is staying the same level, ours is starting to
> deteriorate. At some point, it will come to a point in time when your readiness is less than
> the suspect, and that works against us.

(*Id.* 150:3–11.)

Zelt said he chose the deadline of 8:30 a.m for "a tactical intervention," (*id.* at 109:21),

because "I thought it was important we do that before the peak downtown hour times came, so

that we had less people in the downtown area." (*Id.* at 109:24–110:2.) However, Zelt also

admitted that many if not most people working downtown were already there by 8:30 a.m. (*Id.* at

110:2–16.)

Hunter concurred with the decision to use gas on Escboedo's apartment at 8:30 a.m.

because "I believed at the time that that was a reasonable course of action. . . . Because in the

past the introduction of gas had typically forced a suspect out that would not have normally

come outside." (Hunter 1st Dep. 92:13–23.)  Hunter said the discussion focused on the potential

danger to the increasing number of persons who would be in the downtown area near the

apartment building, especially around nearby St. Joseph Hospital. (*Id.* at 91:5 – 11.) Hunter

wrote in his report after the incident that "[i]t was my opinion that we were not making progress

and Mr. Escobedo was unstable and most likely impaired by alcohol and drugs. For safety

reasons of the surrounding area[,][] Zelt had EST members deploy gas. (Hunter Rpt. 1) (text altered from all caps, errant punctuation omitted).

Lucker responded to the scene initially but left shortly after arriving and conferring with Bender and Chief of Police Rusty York. (Lucker Dep. 20:7–15; DE 51-17). He returned later at 7:30 a.m. or 8 a.m. in order "to see if I could be of any assistance, if they needed coffee or anything like that." (*Id.* at 30:21–22.) Lucker said he was not involved with the decisions to send the entry team into the apartment, (*id.* at 30: 14–17), but at the same time, he participated in the discussion with Bender, Zelt, and Hunter (*id.* at 30:22–24). Lucker described his role as "a peripheral part." (*Id.* at 29:2.)  However, the Defendants identified Lucker as an official who "participated in the decision to fire tear gas into the apartment," (Def. Ans. to Pl. Interrog. No. 35, DE 56-4 at 2–3), and also stated: "Defendants will agree that the above individuals [Bender, Lucker, Zelt, and Hunter] were involved in the decision to introduce tear gas or chemical agents." (Def. Ans. to Pl. Interrog. No. 39, DE 56-4 at 4.) It is not clear from the record how long Lucker stayed at the scene with the other supervisors. Bender said he consulted with Lucker, "who is also a former SWAT team commander," (Bender Dep. 69:20–21), and that Lucker "agreed with me" after Bender made the final decision to use force and enter the apartment (Bender Dep. 70:4–8).

Bender said that he phoned Chief York and briefed him on the situation and plan, and that York agreed. (Bender Dep. 70:8–14.) Bender acknowledged that he did not believe Escobedo had committed a crime by that point and that Escobedo had only threatened himself. (Bender Dep. 71:12–20.) In advance of the planned tear gas, Selvia, Westfield, and others attempted to evacuate residents on the seventh floor with limited success. (Selvia Dep.

49:10–24.)

Danaher, the Plaintiff's expert, was extremely critical of the decision to deploy tear gas and enter the apartment at 8:30 a.m. Danaher's main points were that Escobedo did not pose a threat to officers or the public that required the use of force (Danaher Decl. 6, DE 56-11; Danaher Affid. ¶ 17, DE 55-3); the police decision to use force was premature and based on flawed priorities (Danaher Decl. 10; Danaher Affid. ¶ 17); and the show and use of force was excessive and exacerbated the situation, unnecessarily creating the scenario that led to the fatal shooting of Escobedo (Danaher Decl. 8, 10). Also, Danaher said that Bender and police in general were impatient, and "supervisors valued time over the life of Escobedo." (Danaher Affid. ¶ 33.)

Danaher also made a number of specific criticisms. Escobedo's statements toward the end of negotiations that he might surrender were a positive indication even if it takes a number of such statements before a disturbed person like Escobedo is able to bring himself to follow through and actually surrender. (Danaher Affid. ¶ 16.) The concern about shots being fired toward the hospital works against the Defendants because they initiated a raid where gunfire (by police or Escobedo) was more likely to occur. (Danaher Affid. ¶ 31.) Danaher said he is familiar enough with traffic in Fort Wayne to know it could have been rerouted with minimal inconvenience, and that, in any event, traffic concerns should not have played a role in the decision to use force. (Danaher Affid. ¶ 32.)

**F.    End of Communication with Escobedo and the Use of Chemicals**

After learning that police would deploy tear gas against Escobedo soon, Ebetino

continued his attempts to coax Escobedo into surrendering. At one point, Ebetino believed that police planned to fire gas into Escobedo's apartment at 8:25 a.m. (Ebetino Dep. 119:17–18), but Ebetino's written narrative report of the incident states that EST planned to use the gas at 8:30 a.m. (Ebetino Rpt. 3.) The police did not inform Escobedo of the plan to deploy chemicals or gas against him at 8:30 a.m. (Zelt Dep. 104:16–18.)

At 8:28 a.m., Escobedo told Ebetino he was going to come out of the apartment but he would bring the gun with him, which Ebetino discouraged as unsafe. (Ebetino Dep. 118:6–12; Ebetino Rpt. 3.)  At 8:30 a.m., Escobedo said he would come out of his apartment in three minutes. (Ebetino Dep. 118:21–119:24.) Ebetino conveyed to fellow members of the CRT that he wanted another three minutes to negotiate with Escobedo, (*id.* at 53:4–6), and Ebetino believed that this information or request was conveyed to ERT: "[Y]ou could just see that, I could tell by the body language of the people there that, okay, we're going to wait that three minutes. We're going to keep going. We're going to let him come out in three minutes. I could see it in the faces. . . ." (*Id.* at 119:21–120:7).

Ebetino did not ask for more time beyond that three minute reprieve, and he did not ask other members of the CRT to inform the commanders that Escobedo would surrender if Ebetino were given more time to negotiate. (*Id.* at 53:7–14.) As those three minutes elapsed, Ebetino believed "it was obvious that he was not going to come out," and this belief was "[b]ased on my conversation with him. I told him, 'Hey, three minutes sharp you say you're going to come out,' and he's back to, 'No, I'm not going to come out. I'm going to kill myself.'" (*Id.* at 120:16–22.)

As police prepared to fire the tear gas grenades into the apartment, one of the commanders at the scene told Ebetino to wind down the conversation with Escobedo by claiming

the phone connection "was going bad." (Hunter 2nd Dep. 12:6–16, DE 51-2.) The purpose of
Ebetino's conversation with Escobedo at this point changed to an attempt to determine where
Escobedo was located in the apartment. (Ebetino Rpt. 3.) Ebetino did this for the safety of the
officers who planned to enter Escobedo's apartment. "When I was certain that he was not going
to come out, I did try and determine his location so that he could not be able to harm the officers
if they did in fact, breach the apartment." (Ebetino Dep. 122:10–13.)  Ebetino also reported that
during those final minutes, "[n]othing led me to believe he was preparing to come out." (*Id.* at
152:21–22.)

      As the deadline for using gas approached, the ERT officers on the seventh floor put on
gas masks. Selvia said wearing a gas mask makes it difficult to communicate because it muffles
your voice "quite a bit" for those nearby and those listening on the radio, requiring the person
with the mask to speak slowly. (Selvia Dep. 61:23–62:5.) The other officers said the masks did
not affect their ability to see and/or hear. Danaher said, based on his experience as a member and
leader of SWAT teams, that gas masks distort the voices of those who wear them and cut down
on peripheral vision. (Danaher Affid. ¶¶ 22, 23.) Officers may become used to hearing other
officers wearing gas masks after enough experience so that they can understand commands, but
"for any person who has not had such experience, . . . [commands] would sound distorted and
sometimes indecipherable." (Danaher Affid. ¶ 22.)

      Zelt calculated what he thought would be a "incapacitating concentration" (Zelt Dep.
106:9), of chemicals for Escobedo's apartment. He chose six .37 millimeter liquid rounds, six .37
millimeter Sage powder, and five or ten .12 gauge munitions. (Zelt Dep. 106:18–24.) At 8:33
a.m., Martin, Davis, and Barrientes—stationed behind the armored vehicle located on Fulton

Street on the west side of the building—fired the tear gas rounds into the windows of Escobedo's apartment on the seventh floor. (Def. Ans to P. Interrog. Nos. 33, 34, DE 56-2; Martin Dep. 85:16–86:12, DE 51-22.) Martin believed they fired into the bathroom window of the apartment. (Martin Dep. 88:1–11.) Martin said he fired five rounds in the first volley and five rounds in the second volley. (Martin Dep. 89:10–16.) After all the chemical rounds had been fired, there was "twelve times [the] incapacitating concentration in the apartment." (Zelt Dep. 125:10–11.) Danaher, the Plaintiff's expert, said that amount "was clearly and obviously excessive." (Danaher Affid. ¶ 20.)

Zelt was told that police believed most if not all of the chemical rounds went into Escobedo's apartment. (Zelt Dep. 107:15–17.) One or more members of the entry team thought they might have heard coughing from the apartment, but police received no other response by phone or otherwise. (*Id.* at 107:18–21.) Police waited about ten minutes before Zelt ordered officers to fire the second round of chemical agents into the apartment. (*Id.* at 108:13–15, 113:13–18.)

It is not clear if Ebetino's final request for Escobedo to come out occurred just before or just after gas was deployed. (*See* Ebetino Dep. 123:14–124:3.) Shortly after the gas canisters were fired into the apartment, the fumes became too strong for Ebetino, forcing him and other members of the CRT to flee the area and leave behind the communication equipment. (Ebetino Dep. 124:5–9). This cut off communication with Escobedo. (*Id.* at 124:10–12.) Ebetino had not brought his gas mask from his car to the seventh floor. (Id. at 52:19–24.)

Hunter said that either he or EST suggested to Ebetino that he tell Escobedo that the phone was "going bad . . . in preparation for the deployment of gas." (Hunter 2nd Dep.

21

12:12–16.) Bowers thought that Selvia told Ebetino to end the phone call by telling Escobedo the phone connection was worsening. (Bowers Rpt. 2; DE 54-6.)  As a result, Ebetino ended his phone call before the gas was deployed, according to Hunter. (Hunter 2nd Dep. at 12:23–25.) That was not in accordance with normal procedures. (*Id.* at 13:1–3; Zelt Dep. 100:5–9.) Zelt, the EST commander at the scene, said it also was not standard for a negotiator to leave the scene after chemical agents or gas are used against a subject, (Zelt Dep. 100:11–17), but it occurred here because Ebetino's point of negotiation was unusually close to Escobedo's apartment and Ebetino did not have a gas mask. (*Id.* at 100:21–101:9.)

It does not appear that anyone shared with Zelt or the ERT entry officers the fact that phone communication was cut off with no plan for reestablishing it. Zelt indicated that he thought Escobedo would be able to negotiate either by communicating "face to face with our members as well," (Zelt Dep. 99:1–2), presumably a reference to EST members, or by continuing to speak to Ebetino by phone even if Ebetino was no longer on the seventh floor. (*Id.* at 99:11–14.) Zelt also said that once the tear gas rounds were fired into the apartment, Escobedo "could pick up the phone and call or he could come out." (*Id.* at 108:9–10.)

Ebetino said that, because of the gas, he would not have been able to continue communicating with Escobedo if he stayed on the seventh floor. After that point, Ebetino stated: "By the time I got down to the operations center I believe they were already firing a second round of gas in there and by that time I didn't believe I would be able to re-establish contact so I made no effort to do so." (Ebetino Dep. 157:3–8.) In other standoff situations, police have continued to communicate with a subject after tear gas was fired. (Ebetino Dep. 157:20–24.)

While the tear gas rounds were being shot into Escobedo's apartment, Escobedo was

calling the number of the cellular phone that Taylor originally used to communicate with

Escobedo. (Pl. Surreply 4, DE 83; Escobedo Phone Records 2, DE 83-2.) The records show calls

from Escobedo's phone to Taylor's cellular phone number at 8:34 a.m., 8:36 a.m., 8:39 a.m.,

8:43 a.m., and 8:45 a.m. (Escobedo Phone Records 2.)

After the second volley of tear gas rounds, police waited another ten minutes without

hearing or observing any response. (Zelt Dep. 113: 13–18.) As a result, Zelt ordered Selvia and

his team to breach the apartment door and deploy clear out canisters containing tear gas. (Zelt

Dep. 113:19–114:1.) Police decided to enter the apartment after the gas failed to force Escobedo

out because that is the standard practice of police, and officers needed to check if Escobedo was

still alive or secure him and get him to a hospital. (Hunter 1st Dep. 93:20–94:3.)


### G.      Breach of the Apartment

The EST officers entered the apartment at 8:52 a.m. (Defs. Resp. to Pl. Surreply 3,

DE 88.) Except for Brown, all the officers were armed with a MP5 submachine gun, a Glock

handgun, or both; both weapons fire .9 mm ammunition. Brown was carrying a Sage SL6, a less-

than-lethal shoulder-fired weapon that shoots beanbag rounds meant to stun or disable a person.

A building employee provided a key to the entry team and Selvia tried to use it. Selvia

and Westfield believed that the key did not work in the lock. (Selvia Dep. 60:7–61:7; Westfield

Dep. 74:1–3, DE 51-25.) Lee thought the key unlocked the door but that the door did not readily

open because it was barricaded. (Lee Dep. 96:18–20, DE 51-11.) Westfield thought that the door

had not been barricaded. (Westfield Dep. 74:9–13.) Brown thought the door had been barricaded.

(Brown Dep. 48:3, DE 51-24.)

Westfield used a ram to force the door open. An officer then threw a "clear out" canister of tear gas into the apartment. Westfield, Straub, and Martin thought Selvia was the officer who threw the canister, (Westfield Dep. 74:18–20; Straub Dep. 49:22–25, DE 51-26; Martin Dep. 95:20–22), but Selvia and Lee do not remember who threw it. (Selvia Dep. 63:5–6; Lee Dep. 97:22–23). Some officers recall that Selvia yelled into the apartment for Escobedo to surrender, but Selvia did not recall doing so. (Selvia Dep. 63:1–4.)

After waiting a few minutes and receiving no response, a second canister of tear gas was thrown into the apartment. Officers had the same recollection about the person who threw the second canister as they did about the person who threw the first. Police again received no response. This could have been due to the fact that CS gas "almost eliminates your ability to talk clearly. I mean, if you are incapacitated by it, you are not going to be able to speak very well." (Zelt Dept. 137:11–14.)[2] After once again receiving no response from Escobedo, the team prepared to enter the apartment.

The plan was to throw a flash bang grenade[3] into the apartment to distract and disorient anyone in the main room in order to give officers time to move through the doorway. (Lee Dep. 102:19–103:2.) The fear is that a person planning an ambush need only aim his weapon at the doorway to hit any officer who tries to enter the apartment. (Selvia Dep. 24:20–25:13.) When the

[2] When Zelt made that statement in his deposition, he was referring to Martin's trouble speaking after the seal of his gas mask was broken after shooting Escobedo. Zelt acknowledged that Escobedo would have had the same problems speaking as well.

[3] Individual Defendants usually referred to these items as "distraction devices" rather than flash bangs or flash bang grenades. The Court will refer to them as flash bang grenades because that term most accurately describes what the items do and what they are used for, and because the term is used more often by the Seventh Circuit. *See United States v. Jones*, 214 F.3d 836, 837–38 (7th Cir. 2000) (calling them concussion grenades and "bombs . . . even if the bomb goes by the euphemism 'flash-bang device'"); *United States v. Morris*, 349 F.3d 1009, 1012 (7th Cir. 2003) (flash-bang devices); *United States v. Folks*, 236 F.3d 384, 388 (7th Cir. 2001) (same).

flash bang grenade explodes, it yields an intense light and extremely loud sound. (Selvia Dep. 24:13–17.) It is standard practice or procedure to deploy flash bang grenades when officers enter a barricaded room. (Lee Dep. 103:5–6.) Westfield thought that Selvia threw the flash bang grenade, (Westfield Dep. 75:16–18), but no other officer, including Selvia, could recall who threw it.

The officers then proceeded into the room. Westfield, carrying a 40-pound ballistic shield, entered first. The officers were unclear about the order the rest of the team entered. The entrance door led into a main living area room, and a kitchen was to the officers' left. The room was well lit and there were no visibility problems. One officer described only a slight haze in the air akin to cigarette smoke in a bar. Some officers checked the living room, kitchen, and closets for Escobedo, while others stomped or poured water on a fire that had broken out on the carpet. The fire was a result of the flash bang explosion igniting the propellant of a tear gas canister. (Selvia Dep. 65:14–66:5.)

After determining that no one was in the main room or the kitchen, the officers approached the bedroom door and yelled for Escobedo to surrender. (Selvia Dep. 67:22–5.) When they received no response, someone began using the ram to force the door open. Selvia thought Westfield was using the ram (Selvia Dep. 68:5–12), but Westfield said he was carrying the shield and Lee used the ram on the bedroom door. (Westfield Dep. 81:9–16.) The door did not yield to the ramming blows so Westfield pushed on it with his shield. (Westfield Dep. 81:16–19.) As the officers worked to push the door open, they heard Escobedo yell several times that he had a gun and that it was pointed at his own head, (Westfield Dep. 82:9–10; Brown Dep. 60:14–17), which confirmed for them that Escobedo was in the bedroom.

25

Eventually the officers were able to get the door slightly open enough so that Straub could throw in a flash bang grenade. (Straub Dep. 55:12–17.) Straub had to lean over Westfield and Lee as they held the door open in order to get the device into the bedroom. (Straub Dep. 56:16–21.) Selvia said he ordered a flash bang thrown into the room but that Westfield threw it. (Selvia Dep. 69:9–12.) The room was "pitch black" when the flash bang was thrown in. (Selvia Dep. 69:10–1.) The flash bang grenade exploded in the front of or just inside the bedroom closet where Escobedo was located, (Straub Dep. 60:7–14; Martin Dep. 119:21–120:7), but the officers did not know that until after the incident ended. (Straub Dep. 60:7–14; Martin Dep. 141:10–13.) The door eventually broke, (Martin Dep. 106:18–19; Selvia Dep. 68:19–22), and the opening was large enough for the officers to get into the bedroom.

Danaher said that the officers disregarded the danger of the flash bang grenades when they threw one into the bedroom for several reasons. (Danaher Affid. ¶ 8.) First, the flash bangs' effect is more severe than the Defendants acknowledge: the sound level at close range "could be actually deafening," (Danaher Affid. ¶ 7), or like "a 747 jet taking off inside an apartment" (*id.*), and the light flash of one million candela "at short distances could be actually blinding" (*id.*). Second, police should place a flash bang grenade in a room rather than throwing it so that it does not "land, ricochet, or roll to an area not intended or desirable." (Danaher Affid. ¶ 6.) Third, the officers did not sufficiently examine the room before throwing the grenade. (Danaher Affid. ¶ 8.) As a result of these problems, Danaher said the flash bang grenade exploded only a few feet from Escobedo's head. "Escobedo almost certainly could not hear any verbal commands . . . . I consider it probable that Escobedo was temporarily both blind and deaf at the time he was shot." (Danaher Affid. ¶ 9.)

### H.    Officers in the Bedroom and Fatal Encounter with Escobedo

The record indicates that Westfield, Lee, and Straub entered the bedroom first. Brown

said he was last in line, and it is not clear who (either Martin or Selvia) entered the room in the

fourth and fifth positions. Once the officers entered, they observed that the door had been

barricaded with a large bed frame. (Lee Dep. 114:24–115:3; Martin Dep. 108). The room was

strewn with overturned furniture and other items. (Westfield Dep. 82:4–5.) Unlike the main

living room of the apartment, the bedroom was dark or dim and visibility was poor. (Lee Dep.

116:18–18; Straub Dep. 59:1–6; Selvia Dep. 69:14–24.)

As the officers entered, Escobedo continued to yell that he had a gun and that it was

pointed at his head. (Brown Dep. 60:14–17; Westfield Dep. 83:1–8; Straub 62:15–16). One or

more officers were shouting for Escobedo to put the gun down and show his hands to the

officers. (Straub Dep. 69:19–22.) Westfield was yelling that he could not see Escobedo.

(Westfield Dep. 85:15–18.) Selvia described it as "there was some screaming. . . . I couldn't

make out what was being yelled. I didn't know if it was my own team doing it, at first, or what,

or whether it was Mr. Escobedo that was yelling. I just heard yelling. I didn't know where it was

coming from." (Selvia Dep. 73: 1–7.)

Westfield, Lee, and Straub moved to their left toward the bathroom because they believed

Escobedo was hiding in that room. (Westfield Dep. 83:1–3, 87:10–12.) A mattress had been

placed over the bathroom doorway, indicating to Straub that its purpose was to conceal someone

hiding directly behind it in the bathroom or further inside the bathroom. (Straub Dep.

61:24–62:9.) Lee thought Escobedo would be in the bathroom because most persons subjected to

tear gas move to a source of water to wash their face and obtain wet towels. (Lee Dep.

119:16–22.)

As they approached the bathroom, Straub noticed an open closet that officers had not checked, so he yelled out a warning to the other officers. (Straub Dep. 63:6–17.) The closet was to the right of the bathroom. Straub stood on a chair in an attempt to see into the bathroom as Lee and Westfield approached the door. (Straub Dep. 63:25–64:17.) Lee asked Westfield to raise his shield in order to provide cover for Lee to raise his head and check the bathroom. (Lee Dep. 122:16–20.) At that moment, Lee heard Martin yell out, indicating Martin had found Escobedo. (Lee Dep. 122:22–24.)

Martin had entered the room and moved to the right. Martin believed that he had heard Lee and Westfield shouting for Escobedo to drop his gun. (Martin Dep. 110:10–12.) As Martin entered the room, he believed that "I was going to get shot or the two guys [Westfield and Lee] were going to probably go down the minute we made entry into that room." (Martin Dep. 111:10–12.) Martin thought at the time that Westfield and Lee "had a direct line of sight with that suspect and I just had a horrible feeling that we were going to start getting shot." (Martin Dep. 111:17–19.)

As Martin advanced into the room, he did not expect Escobedo to be in the closet. (Martin Dep. 140:21–24.) When Martin caught sight of Escobedo, he was sitting on the ground with his legs extended in front of him and knees slightly bent. (*Id.* at 113:14–16, 114:23.) Martin said that as he moved to his right, the doorjamb of the closet was no longer between Martin and Escobedo, and Martin quickly had a full view of Escobedo with no cover in between them. (*Id.* at 115:18–8.) Escobedo was pointing his gun upside down at his head with his left hand. (*Id.* at 113:14–16; 115:5–6.) Martin could tell that the hammer on Escobedo's gun had been pulled

back. (*Id.* at 119:6–8.)

Martin announced several times that Escobedo was in the closet and that he was pointing a gun at his own head. (*Id.* at 117:19–22.) Martin then ordered Escobedo to drop his gun several times, and Escobedo began to lower his gun "towards me, pointing it at me." (*Id.* at 117:24–118:3; 142:5–12.) At that point, Martin said he fired because he was in fear of his own life as he was afraid he would be shot or another officer would be shot. (*Id.* at 142:19–143:2.) Escobedo never made any statements to Martin during the encounter. (*Id.* at 142:13–15.)

As Martin was moving toward Escobedo, Brown was behind Martin. When Brown heard Martin's shouts that Escobedo had a gun and Martin's commands that Escobedo drop the gun, Brown saw Martin "take two quick steps backwards" while Martin pointed his gun and flashlight at Escobedo inside the closet. (Brown Dep. 69:6–12.) Brown moved forward, positioning himself to Martin's left with a view of the closet and Escobedo holding the gun to his own head. (Brown Dep. 73:1–7; 75:17–22.) As Selvia heard Martin's commands to Escobedo, he yelled for Brown to fire his Sage weapon at Escobedo. (Selvia Rpt. 1; DE 54-7.) Selvia ordered Brown to fire the Sage weapon at Escboedo in an attempt to disarm him. (Selvia Dep. 78:2–6.) But "[a]bout the time that came out of my mouth, Officer Martin had already started to shoot." (Selvia Dep. 78:7–8.) Selvia described Martin shooting and his own command to Brown as "simultaneous." (Selvia Dep. 78:16.)

According to Brown, "Mr. Escobedo lowered his weapon from his head, pointed it directly in the direction of Brian [Martin]. At that point, I decided to shoot." (Brown Dep. 74:2–4.) Escobedo's left arm was not quite fully extended when he pointed the gun at Martin. (*Id.* at 74:7–75:16.) Brown realized at the time that firing the Sage weapon from such a close

29

range[4] could be lethal force. (*Id.* at 94:10–13.) Brown said that when he fired, he believed Martin's life was in danger and lethal force was warranted. (*Id.* at 94:6–16.)

Even though both officers decided to fire at the same time, when they saw Escobedo point his gun at Martin, Brown said Martin fired first, (Brown Dep. 76:1–2), probably because the trigger pull on the Sage weapon is long and the weapon is harder to fire than the .9 mm Glock pistol that Martin was using. (Brown Dep. 76:5–14). Martin was unsure of who fired first or whether it was simultaneous. (Martin Dep. 122:18–3.)

Martin thought he was about four to six feet from Escobedo when he aimed at Escobedo's center mass and fired. (Martin Dep. 118:22–24, 121:17.) Martin believed he fired only two or three times but later learned it was more. (Martin Dep. 12–17.) The record does not indicate how many times Martin fired in the first volley.

Brown was also aiming for Escobedo's center mass as he fired the Sage weapon, but the rounds hit one of Escobedo's legs. (Brown Dep. 77:24–78:8.) Brown said he was ten to twelve feet from Escobedo when he fired. (Brown Dep. 92:15) and that he initially fired two or three times. (Brown Dep. 79:20–21.)

After the initial shots from Martin and Brown, Escobedo dropped the gun between his legs. The gun was partially on the floor and partially on Escobedo's body. (Martin Dep. 144:4–7.) Both officers observed Escobedo reach and/or lean forward in an apparent attempt to pick up the gun again. "To me, it appeared as if he was reaching down for the gun." (Brown Dep. 89:5–6.) Martin said that Escobedo "leaned forward with both hands towards the gun and I felt he was going to pick the gun up and try to shoot." (Martin Dep. 121:20–23.) Straub thought that

---

[4] The Sage weapon's sighting system had settings for as far away as 100 meters. The closest range setting is 20 meters. (Brown Dep. 91:6–15.) Twenty meters is approximately sixty-five feet.

he heard Martin say something such as "don't," or "stop," in between the volley of shots. (Straub Dep. 69:11–21.)

Martin and Brown then fired a second time. Martin fired a total of nine or ten shots during the entire incident. (Martin Dep. 122:2–3.) Brown fired a total of six times during the entire incident. (Brown Dep. 80:17–18.) Brown thought Escobedo's body moved backward after the second round of shots. (Brown Dep. 88:23–89:2.) Martin believed that Escobedo's upper body slumped far forward after the shooting. (Martin Dep. 136:4–7.)

Martin then moved toward the closet in order to grab Escobedo's gun and put flex cuffs on Escboedo, but as Martin bent down he hit the side of his head against the doorjamb, causing the seal on his gas mask to break and allowing tear gas in. (Martin Dep. 123:10–13; 124:8–11.) Martin grabbed the gun because he did not know if Escobedo was still alive "and the threat was the gun at that point." (*Id.* at 124:17–20.) Martin carried the gun out of the apartment and the building to the command center. (*Id.* at 124:22–23.) Martin left the scene while holding the gun because the tear gas was affecting him. (*Id.* at 124:9–15, 137:4–5.)

Brown called over the radio for a medic, who was stationed in the hallway. (Brown Dep. 89:19–21; Selvia Dep. 81:13–19.) Escobedo was alive for a short time after the shooting. (Brown Dep. 90:2–3; Lee Dep. 131:7–11.) Lee tried to move Escobedo out of the closet so that medical personnel could check on him, but he was unable to do so until a medic arrived. (Lee Dep. 130:18–22.) Lee ran to the sixth floor to get a stretcher, but when he returned the medic told him that Escobedo was dead. (Lee Dep. 131:19–132:4.) Escobedo was declared dead at the scene at about 8:59 a.m. (Postmortem Rpt. 3; DE 52-6.)

**ANALYSIS**

The Plaintiff, in her capacity as executrix of the estate of Escobedo, brings this civil

rights lawsuit under 42 U.S.C. § 1983, which states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of
> any State or Territory or the District of Columbia, subjects, or causes to be subjected, any
> citizen of the United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress . . . .

42 U.S.C. § 1983. "To state a claim under 42 U.S.C. § 1983, a plaintiff must present facts

sufficient to show that the defendants, acting under color of state law, deprived him of a specific

right or interest secured by the Constitution or laws of the United States." *Bublitz v. Cottey*, 327

F.3d 485, 488 (7th Cir. 2003).

The Constitutional right at issue in this case is the Fourth Amendment's protection "for

the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures." U.S. Const. amend. IV. There is no dispute that the Defendants were

acting under color of state law. The issues are whether a seizure occurred, and if so, whether the

force used to effectuate the seizure was reasonable. If the force the Defendants used against

Escobedo was excessive, then it violated his Constitutional rights.

**A.      Seizure**

Before undertaking any analysis of the reasonableness of the Defendants' actions, the

Court must determine whether, and when, a seizure occurred. This is important because "pre-

seizure conduct is not subject to Fourth Amendment scrutiny." *Carter v. Buscher*, 973 F.2d

1328, 1332 (7th Cir. 1992).

The Defendants argue that "Escobedo was not actually seized within the meaning of the Fourth Amendment <u>until</u> the point when he was shot." (Defs' Mem. of Law in Support of Mot. for Summ. J. 35; DE 39.) The Plaintiff calls the Defendants' position "outrageous," (Pl. Br. in Opp. to Defs' Mot. for Summ. J. 46; DE 49), and argues that the seizure was from when "police forces surrounded Escobedo's apartment with weapons drawn to the point of Escobedo's death." (*Id.* at 44.)

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement, through means intentionally applied." *Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007) (quotations and citation omitted). "We think it enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower v. County of Inyo*, 489 U.S. 593, 599 (1989). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Id.* (citing *California v. Hodari D.*, 499 U.S. 621, 626 n.2 (1991)).

Courts also use the "*Mendenhall* test," derived from *United States v. Mendenhall*, 446 U.S. 544 (1980), which, among other things, made clear that the analysis is objective, not subjective: "We conclude that a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554. The Supreme Court then stated:

> Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.

*Id.* In *Brendlin*, the Court said the *Mendenhall* test is only for "[w]hen the actions of the police do not show an unambiguous intent to restrain or when an individual's submission to a show of governmental authority takes the form of passive acquiescence." *Brendlin*, 127 S. Ct. at 2405. The Supreme Court also noted later that the *Mendenhall* test "states a necessary, but not a sufficient, condition for seizure—or, more precisely, for seizure effected through a 'show of authority.'" *Hodari D.*, 499 U.S. at 628. The other condition is that either the suspect is touched by the police, or he yields or submits to the show of authority. *Id.* at 627–29 (holding that the suspect in that case was not seized during a foot chase but only when police tackled him).

Analysis of the seizure issue "is a highly fact-bound inquiry," *United States v. Tyler*, 512 F.3d 405, 410 (7th Cir. 2008), and courts may use a number of factors:

> whether the encounter took place in a public place or whether police removed the person to another location; whether the police told the person he was not under arrest and was free to leave; whether the police informed the person that he was suspected of a crime or the target of an investigation; whether the person was deprived of identification or other documents without which he could not leave (such as a driver's license or train or airline ticket); and whether there was any limitation of the person's movement such as physical touching, display of a weapon, or other coercive conduct on the part of the police that indicates cooperation is required.

*Id.* In addition to those factors, the Seventh Circuit has also employed "two overarching themes":

> (1) the nature and degree of the official inducement, and (2) the extent of the restrictions on the citizen's desired freedom of movement. The first of these themes reflects the type of threatening police action . . . and the cost of ignoring the official's demands, while the second informs whether the citizen had reasonable options available to him.

*Kernats v. O'Sullivan*, 35 F.3d 1171, 1178 (7th Cir. 1994). "In our view, a seizure typically

34

involves an almost complete restriction of movement—either a laying of hands of a close

connection (both temporally and spatially) between the show of authority and the compliance."

*Id.* at 1180.

While these principles guide the analysis of whether and when a seizure occurred in this

case, they are of limited applicability to the facts here. The Supreme Court has not considered

the issue of whether a seizure occurred in the context of a police barricade situation. Instead, the

seizure issue at the Supreme Court level has involved car chases, road blockades, traffic stops,

and face-to-face interactions between police and suspects.

Neither does it appear that the Seventh Circuit has considered the Fourth Amendment

seizure issue—or the reasonableness of police force, for that matter—in a case where a person

has barricaded himself from the police.[5] A case with similar facts might be *United States v.*

*Jerez*, 108 F.3d 684 (7th Cir. 1997). In that case, two officers repeatedly knocked on a hotel door

and window, essentially forcing the occupants to open the door. *Id.* at 691–92. "A reasonable

person in their situation could conclude only that the deputies would not leave unless the door

was opened." *Id.* at 693. The seizure analysis in that case took its cue from "[t]he second

approach articulated by the Supreme Court[,] . . . when the police approach an individual in a

confined space such as a bus. In such a situation, it no longer 'makes sense to inquire whether a

reasonable person would feel free to continue walking.'" *Id.* at 689 (quoting *Florida v. Bostick*,

501 U.S. 429, 435 (1991)). The rationale for this second approach was:

_____

[5] In *Cabell v. Rousseau*, 130 F. App'x 803, 806 (7th Cir. 2005), the court found that no seizure occurred when a SWAT team, executing an arrest warrant, and the plaintiff exchanged gunfire because no police bullets hit the plaintiff and the plaintiff never submitted to police authority but instead shot at them. That case has such significant factual differences that its finding that there was not a seizure is of little aid to this case. In *Cabell*, police entered the home within seven seconds of the start of the raid, the plaintiff shot at the officers and hit two of them, and the plaintiff surrendered several moments after that. *Id.* at 805.

> Because a person on a bus or in an otherwise confining space "has no desire to leave" and would wish to remain even if police were not present, "the degree to which a reasonable person would feel that he or she could leave is not an accurate measure of the coercive effect of the encounter." When a person's "freedom of movement [is] restricted by a factor independent of police conduct—i.e., by his being a passenger on a bus . . . , the appropriate inquiry is whether a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter."

*Id.* (citations omitted) (quoting *Bostick*, 501 U.S. at 435–36). The Seventh Circuit made a similar point in *Kernats v. O'Sullivan*, 35 F.3d 1171 (7th Cir. 1994):

> [A]ssume that a group of armed officials, guns drawn, surrounds a citizen in the doorway of her office and threatens to kill her. If that citizen then retreats into her office, locking the door and perhaps barricading it as well, it would be reasonable to conclude that she has been seized although no one laid hands on her. It is enough that as a result of a prominent show of authority she was immediately confined to a small space with no viable means of otherwise terminating the encounter.

*Id.* at 1180.

The Seventh Circuit used the same approach in another case, *United States v. Adeyeye*, 359 F.3d 457 (7th Cir. 2007), to find that a seizure did not occur. Noting that the factual scenario in *Adeyeye* "contrasts sharply with the *Jerez* conduct," *id.* at 462, the court stated:

> [T]he officers approached the room in the middle of the afternoon. The [officers] knocked only twice, stating at the time of the second knock that they could return later if it was an inconvenient time. Adeyeye acknowledges hearing the officers make that statement. A reasonable person in that position, having been provided the alternative of telling the officers it was an inconvenient time, would have felt free to terminate the encounter.

*Id.* Also of some help is *Belcher v. Norton*, 497 F.3d 742 (7th Cir. 2007). In that case, a law enforcement officer refused to let the owners of a vehicle in a towing yard leave (by verbal commands and blocking the exit with his vehicle) and threatened arrest unless they signed over the vehicle's title to the yard owner, which they eventually did. *Id.* at 745–46. "The officer clearly asserted his authority in a way that the plaintiffs reasonably could construe as a

declaration that they were not free to leave the tow yard. Such a declaration by a police officer is sufficient to constitute a 'seizure' for purposes of the Fourth Amendment." *Id.* at 748.

The conduct of the Defendants in this case, starting when the ERT took position outside Escobedo's apartment and when numerous uniformed officers stationed themselves around the apartment building, fit the definition of a "seizure" as articulated in *Brendlin*.  Members of the Fort Wayne Police Department displayed a show of authority by surrounding Escobedo's apartment and building. The Defendants used a negotiator, members of the ERT, patrol officers, and a mobile command center to take control of the situation. This show of authority would make obvious to a reasonable person inside Escobedo's apartment that he must obey the commands of police, specifically, to come out of the apartment unarmed. Bender and Lucker made clear in their depositions that the Defendants intended to take control of Escobedo. He was not to be left alone in his apartment, and he was not to leave on his own. He could only leave if he was in police custody so that he could undergo a mental health evaluation. A reasonable person would not have believed he would have been free to terminate the encounter, either by ignoring police communications and commands and simply going about his business inside the apartment (e.g., sleeping, watching television) without further police interaction, or by leaving the apartment and going about his business in the city at large.

The situation here fits several of what the Supreme Court has called the "circumstances that might indicate a seizure, even where the person did not attempt to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Those are: "the threatening presence of several officers [and] the display of a weapon by an officer." *Id.* A reasonable person would certainly have been threatened by the presence of snipers, armor-clad ERT officers carrying shotguns, pistols, or

submachine guns, a mobile command center next to the apartment building, and numerous uniformed officers in the area around the building.

The factors listed in *Tyler*, 512 F.3d at 410, also indicate a seizure took place, even if that case was referring to face-to-face police-suspect encounters. First, while this was not a case where officers could either deal with Escobedo in public or remove him to a more private location (because they did not have the ability to "move" Escobedo anywhere), they did have the power to prevent him from leaving. Second, while the police did not tell Escobedo he was "under arrest," they made clear to him that he must comply with their instructions. It was obvious to Escobedo that he was not free to leave. Third, the police did not inform Escobedo he was suspected of a crime or the target of an investigation. The fourth factor, involving the deprivation of documents and resulting limits on mobility, is inapplicable. The fifth factor is the most relevant: there was not just "any limitation of the person's movement," *id.*, but an almost complete limit on his movement. Escobedo could not leave or be left to his own accord. There was more than one "display of a weapon," *id.*, as well as "other coercive conduct on the part of police that indicates cooperation is required," *id.*, such as requesting and ordering he surrender, firing tear gas grenades into his apartment, breaching his door, etc. The factors, as presented at the summary judgment stage, weigh in favor of finding that Escobedo was seized long before he was shot.

Application of the "two overarching themes" mentioned in *Kernats*, 35 F.3d at 1178, also indicates that Escobedo was seized. First, "the official inducement" was severe and clear: Escobedo must surrender. This was not a suggestion to speed up his movement, leave a scene, or clear a right-of-way. This was a command, backed by the force of dozens of officers, the ERT,

38

and an armored vehicle. A reasonable person in Escobedo's situation would quickly figure out that "the type of threatening police action," such as the high number of deployed officers, particularly officers from the ERT, indicates that "the cost of ignoring the official's demands" would not be something as minor as a brief detention for a warrant check or a ticket. When that many officers are deployed, especially officers from a specialized unit, the goal is clear: make the suspect comply with commands, and take custody or control of him. Second, the restrictions on Escobedo's freedom of movement were significant in this case. He was not free to leave the apartment and do as he wished. The police intended to take him into custody for a mental health evaluation. Nor was Escobedo free to be left alone in his apartment. He did not have "reasonable options," such as departing the scene of a traffic stop or a face-to-face encounter with police on the street.

The situation in this case is much more similar to the facts in *Jerez* than in *Adeyeye*. Just as a reasonable person in the place of the two *Jerez* defendants would conclude that the deputies would not leave until the door was opened, 108 F.3d at 693, so too a reasonable person here would conclude that police would not leave until he obeyed their commands to surrender by leaving the apartment unarmed. This was not a situation where a few officers from the Fort Wayne Police Department were making a brief inquiry and offered to return at a more convenient time. *See Adeyeye*, 359 F.3d at 462. Once the Defendants began using Ebetino as a negotiator and deployed the CRT and ERT, they were there to stay. There was no indication that a reasonable person in the circumstances would have observed that there was anything the person could do, other than surrendering as ordered, for the police to end the show of authority and leave.

The scenario here is also similar, though not identical, to the hypothetical seizure in *Kernats*. "A group of armed officials, guns drawn," 35 F.3d at 1180, were surrounding Escobedo's apartment.[6] If a reasonable person retreated further into his apartment and barricaded the entry, as Escobedo did and as the *Kernats* court described, then "it would be reasonable to conclude that [the person] has been seized although no one laid hands on [the person]. *Id.* In this case, "[i]t is enough that as a result of a prominent show of authority," *id.*, a reasonable person in Escobedo's place "was immediately confined to a small space with no viable means of otherwise terminating the encounter." *Id.*

The inability to leave Escobedo's apartment or ignore the commands of police completed the seizure and constituted the required "submission" or "yield" by Escobedo. The court in *Kernats* described a very similar scenario as "enough," 35 F.3d at 1178, to fit the definition of a seizure. Escobedo's inability to leave or be left alone can be characterized as "when an individual's submission to a show of governmental authority takes the form of passive acquiescence." *Brendlin v. California*, 127 S. Ct. 2400, 2405 (2007). In other words, Escobedo yielded or submitted because he was unable to move about as he wished as a result of the police intentionally applying means (officers, ERT, armored car, tear gas) to restrain his freedom of movement. *See id.*

The conclusion that a seizure occurred in this police barricade situation finds support in

---

[6] The Court is well aware that one significant difference between this case and the *Kernats* hypothetical is that there is no allegation here that the Defendants "threaten[ed] to kill" the Plaintiff, as the *Kernats* court hypothesized. 35 F.3d at 1180.

the decisions of other circuits[7] that, unlike the Seventh Circuit, have had occasion to consider

Fourth Amendment excessive force claims involving barricaded suspects. A Sixth Circuit case,

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002), stemmed from an incident between

police and an armed, paranoid schizophrenic, John M. Lekan. The standoff occurred after police

officers went to Lekan's home to check on the welfare of Lekan's wife and child; Lekan shot one

of the officers during that visit. *Id.* at 497–99. Police deployed the ERT, a hostage negotiator,

and eventually an armored vehicle. *Id.* at 498–99. The court found there was a seizure when

police surrounded the man's house:

> There can be little question under the circumstances that Mr. Lekan was not free to leave.
> . . . [A]lthough Mr. Lekan was never in police custody, the police surrounded the house
> and paraded an armored vehicle in front of the Lekans' house. These actions qualify as an
> intentional application of physical force and show of authority made with the intent of
> acquiring physical control. Moreover, this assertion of force and authority succeeded in
> restraining Mr. Lekan's liberty to leave his home.

*Id.* at 506. The court[8] specifically rejected the district court's conclusion that no seizure

occurred, a conclusion based on the theory that because Lekan barricaded himself in his home,

he never submitted to authority. *Id.* While this decision and the others in footnote seven are of

---

[7] *See, e.g.,  Fisher v. City of San Jose*, 509 F.3d 952, 965 (9th Cir. 2007) (suspect was seized "when police surrounded his home and stationed a sharpshooter to watch him" even though he had not yet been formally arrested or taken into custody); *McCracken v. Freed*, 243 F. App'x 702, 708 (3d Cir. 2007) (plaintiff was seized when tactical police team threw pepper spray canisters into the house "with the intent of temporarily debilitating any persons occupying the home" because plaintiff's "freedom of movement was terminated by the pepper spray canisters"); *Phillips v. James*, 422 F.3d 1075 at 1080–83 (10th Cir. 2005) (agreeing with district court's assumption that the "initial seizure" of the armed suspect occurred when officers asked him to come out of his closed bedroom where he was barricaded); *Estate of Smith v. Marasco*, 318 F.3d 497 (3d Cir. 2003) (treating as a seizure the police tactical squad's establishment of a perimeter around a home after officers believed a gun's laser sight was pointed at them); *United States v. Al-Azzawy*, 784 F.2d 890, 893 (9th Cir. 1985) (finding a seizure when "the police had completely surrounded appellee's trailer with their weapons drawn and ordered him through a bullhorn to leave the trailer and drop to his knees").

[8] The Sixth Circuit later relied on *Ewolski* to find there was a seizure during another police-suspect barricade situation: "By laying siege to Bing's house, breaking his door and windows, and employing pepper gas, the police accomplished a de facto house arrest, i.e., a Fourth Amendment seizure." *Estate of Bing v. City of Whitehall*, 456 F.3d 555, 564 (6th Cir. 2006).

course not binding on this Court, they provide persuasive authority and generally accord with the Seventh Circuit's approach in *Jerez* and *Kernats*.

Because the Court has determined that the Defendants seized Escobedo,[9] the Court now turns to the more difficult analysis of whether the manner in which he was seized, through the applications of force, was reasonable or excessive.

### B.    Excessive Force

A plaintiff may bring a § 1983 suit against individual officers in either their official or individual capacity or both. In this case, the Plaintiff is suing the Defendants in their individual capacities. In order to establish such a claim under § 1983, the Plaintiff must show that the Defendants were personally involved in depriving him of his constitutional rights. *See Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413 (7th Cir. 1997); *Gossmeyer v. McDonald*, 128 F.3d 481, 494 (7th Cir. 1997) (quoting *Black v. Lane*, 22 F.3d 1395, 1401 (7th Cir. 1994)).

In cases involving arrest, investigatory stop, or other "seizure" of a free citizen, the "objective reasonableness" standard of the Fourth Amendment applies. *Wilson v. Williams*, 83 F.3d 870, 874 (7th Cir. 1996) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

> The Fourth Amendment protects against unreasonable seizures, not seizures that "shock the conscience" or cause "severe injuries." If, under the totality of circumstances, a police officer unreasonably seizes a person by using excessive force, he has violated that person's Fourth Amendment rights. The objectively unreasonable seizure itself (regardless of the officer's motive or whether any injury inflicted was severe) crosses the constitutional threshold.

---

[9] The Court could also find that a seizure occurred when Martin and the other officers fired the tear gas into Escobedo's apartment. At that point, a reasonable person would not "feel free to decline the officers' request," *Jerez*, 108 F.3d at 689, backed up by tear gas, or "means of physical force . . . intentionally applied," *Brendlin*, 127 S. Ct at 2405, to leave the apartment. The inducement to obey police at this point is significant, and the extent of restriction on a person's freedom of movement would be severe in light of the effect of the tear gas. *Kernats*, 35 F.3d at 1178.

*Lester v. City of Chi.*, 830 F.2d 706, 712 (7th Cir. 1987); *see also Graham*, 490 U.S. at 397

("The reasonableness inquiry is an objective one. The question is whether the officers' actions

are objectively reasonable in light of the facts and circumstances confronting them, without

regard to their underlying intent or motivation."). To decide whether the amount of force used

was excessive, the court must "examine the totality of the circumstances to determine whether

the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing

government interests at stake." *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000).

Relevant considerations include "the severity of the crime at issue, whether the suspect

poses an immediate threat to the safety of the officers or others, and whether [the suspect] is

actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.

Mental illness may also be considered as a relevant factor. *Sallenger v. Oakes*, 473 F.3d 731, 739

(7th Cir. 2007). Of course, the "calculus of reasonableness must embody allowance for the fact

that police officers are often forced to make split-second judgments—in circumstances that are

tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a

particular situation." *Graham*, 490 U.S. at 396–97. Thus, courts must examine the

reasonableness of the actions "from the perspective of a reasonable officer on the scene, rather

than with the 20/20 vision of hindsight." *Id.* at 396.

Law enforcement officers are entitled to a defense of qualified immunity in actions

against them founded upon the United States Constitution or federal law. A police officer will be

entitled to immunity when a reasonable police officer could have believed that his conduct was

constitutional in light of clearly established law and the information he possessed at the time.

*Anderson v. Creighton*, 483 U.S. 635, 639 (1987); *Frazell v. E.K. Flanigan*, 102 F.3d 877, 886

(7th Cir. 1996).

> The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct. It is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. An officer might correctly perceive all of the relevant facts but have a mistaken understanding as to whether a particular amount of force is legal in those circumstances. If the officer's mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense.

*Saucier v. Katz*, 533 U.S. 194, 205 (2001). "The police cannot have the specter of a § 1983 suit hanging over their heads . . . as long as their behavior falls within objectively reasonable limits." *Clash v. Beatty*, 77 F.3d 1045, 1048 (7th Cir. 1996). "Although the privilege of qualified immunity is a defense, the plaintiff carries the burden of defeating it." *See Mannoia v. Farrow*, 476 F.3d 453, 457 (7th Cir. 2007).

Under United States Supreme Court precedent, the analysis of a qualified immunity defense requires a two-step inquiry. First, a court must answer the threshold question whether the alleged facts, taken in the light most favorable to the party asserting the injury, show that the officer's conduct violated a constitutional right. *Saucier*, 533 U.S. at 201. Second, assuming that a plaintiff is able to establish a constitutional violation under a favorable view of the facts, "the next, sequential step is to ask whether the right was clearly established." *Id.* In other words, a court must consider whether the law clearly established that the officer's conduct was unlawful in the circumstances of the case. *Id.*

> To be clearly established, the right in question must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006) (quoting *Anderson v. Creighton*, 483 U.S.

635, 640 (1987)). This inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.

"For a right to be clearly established, however, we need not have a prior case that is founded on materially similar facts; officials may still be on notice in 'novel factual circumstances.'" *Miller v. Jones*, 444 F.3d at 934 (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *McDonald v. Haskins*, 966 F.2d 292, 295 (7th Cir. 1992) ("It would create perverse incentives indeed if a qualified immunity defense could succeed against those types of claims that have not previously arisen because the behavior alleged is so egregious that no like case is on the books."); *see also Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001) (identifying two routes for proving that a right is clearly established: (1) the violation is so obvious that a reasonable officer would know that what he was doing violates the Constitution, or (2) a closely analogous case establishes that the conduct is unconstitutional).

The ultimate inquiry is whether the state of the law on July 19, 2005, gave the Defendants fair warning that their treatment of Escobedo was unconstitutional. *Hope*, 536 U.S. at 741.

**1.**     ***Firing Tear Gas Into Escobedo's Apartment***

The first point when the Defendants began using force against Escobedo during their seizure was when Martin and two other officers,[10] stationed in the street, fired tear gas canisters

---

[10] The other two officers, Davis and Barrientes, who also fired tear gas canisters into the apartment at the same time as Martin are not defendants in this case. The Plaintiff stated in its Response to the summary judgment motion that her excessive force claim for use of chemical agents is also made against the members of the entry team–Martin, Brown, Selvia, and Straub–as well as the supervisory officers. This section only analyzes Martin's use of chemical agents by firing tear gas canisters through the apartment windows.

through the windows of Escobedo's apartment upon the orders of the supervising officers.[11]

(a) *Did Firing Tear Gas into the Apartment Violate Escobedo's Constitutional Rights?*

To determine whether the use of tear gas was excessive force, the Court looks to the *Graham* factors. The first *Graham* factor is the severity of the crime. Police only went to Escobedo's apartment because Escobedo himself called 911 for help. The Defendants acknowledge that their intent was not to arrest Escobedo for committing a crime but to take him into custody in order to prevent him from hurting himself and to obtain a mental health evaluation for him. The only crime an officer could have suspected Escobedo of having committed at that point was possession of cocaine since Escobedo had admitted during the 911 call that he had recently used cocaine. Even though police knew Escobedo had a gun, there is nothing in the record to indicate that officers believed he was a felon in possession of a firearm.

The second *Graham* factor—whether Escobedo posed an immediate threat to the safety of the officers or others—is the subject of much dispute. Instead of evaluating whether Escobedo posed a threat, the issue is better framed as whether a reasonable officer at the time would have thought Escobedo posed an immediate threat to officers or the public.

The Defendants, among themselves, do not have the same opinion about the level of threat Escobedo posed. Ebetino said Escobedo did not make any threats (other than perhaps the one statement that he would exit the apartment with the gun in his hand). On the other hand, Zelt believed that Escobedo posed a deadly threat throughout the entire incident because Escobedo could have started shooting at officers or the public. However, Zelt indicated that his assessment

---

[11] The Court analyzes any supervisor liability for this use of force in C.1.(a), *infra*.

46

was based on reviewing the 911 transcript and some of Escobedo's comments to Ebetino, both of which were not available to Zelt during the incident. Hunter testified that he did not assess whether Escobedo was a threat and based his concurrence with the tactical plan on other considerations, but he also wrote in a report after the incident that the threat to the area was a factor in his concurrence.

An objective analysis of the situation from the perspective of a reasonable police officer, as called for by *Graham*, leads to the conclusion that Escobedo did not pose an *immediate* threat to police or the public that justified shooting tear gas canisters through his apartment windows. Escobedo certainly posed *some* level of threat or potential threat because he was armed, suicidal, under the influence of drugs and alcohol, and perhaps suffering from a mental illness. But there is nothing in the record that indicates he posed an immediate threat, that is, he was taking action that could at any moment harm police or the public. For example, he did not wave his gun out the window (or even open or come near the windows), point his gun at officers or the public, fire his gun inside his apartment (which might injure others if the bullet penetrated the walls, floor, or ceiling), or even state that he would shoot officers or members of the public. Another indication that he was not an immediate threat was the close proximity of Ebetino during the negotiations. After taking over negotations from Taylor, Ebetino, if he believed there was an immediate threat, would have moved to a more distant and safe location from his spot just down the hallway from Escobedo's door. A reasonable officer reviewing the past several hours of the incident at 8:30 a.m. would take note of Ebetino's conduct as well as the lack of overt threats in words or action by Escobedo and conclude that Escobedo did not pose an immediate threat to police or the public.

The third *Graham* factor does not lend itself to the Defendant's position. Flight was not a factor given that Escobedo was barricaded inside his own apartment and surrounded by several dozen well-armed police officers. As to whether Escobedo was actively resisting arrest, it must be observed that police were not trying to effectuate an arrest in the traditional sense, even if taking him into custody for a mental health evaluation is a seizure for Fourth Amendment purposes. Escobedo's conduct of staying inside his apartment is not the sort of behavior usually associated with actively resisting arrest in excessive force cases, such as grappling and fighting with an officer, *see, e.g., Tom v. Voida*, 963 F.2d 952 (7th Cir. 1992) (stronger suspect hit officer's head many times and beat her severely before being shot), *Henning v. O'Leary*, 477 F.3d 492 (7th Cir. 2007) (suspect reached for officer's loose gun during intense scuffle with several officers). Escobedo's behavior did not present the tense, rapidly evolving circumstances present with suspects who can physically engage with officers.

In light of these considerations, the Court must decide whether the governmental interest justified the intrusion on Escobedo's rights. In the beginning, the governmental interest was to persuade Escobedo to surrender peacefully and not harm himself. Unlike many other police standoff cases, the government here did not have to contend with a wounded or unwounded hostage, someone with a demonstrated history of violence, or a person who has tried (or even threatened) to harm police or the public. On the other hand, the police did face the challenge of communicating with a distraught person who was under the influence of drugs and alcohol, perhaps suffering from mental illness, and whose statements were often nonsensical and/or contradictory.

As time went on, the Defendants, mainly Bender as the commander of the scene, claim

that other governmental interests came into consideration and warranted the entire spectrum of the use of force police used in their attempt to formally take Escobedo into custody. These interests were controlling the general area around the incident, particularly people walking to nearby residences and businesses; the effect of street blockades on traffic flow, especially during peak traffic times; and the potential threat to and safety of persons walking near the apartment building, including in and out of nearby St. Joseph Hospital. Affecting these interests were the deteriorating readiness of tactical officers and the Defendants' view that negotiations were not working.

There are genuine issues of material fact surrounding these factors that preclude the Court from finding that firing tear gas into the apartment at 8:30 a.m. was reasonable.  There are also genuine issues of material fact whether, in light of the governmental interests, a reasonable officer would have considered the same or different factors, and done so in a different way, than did the Defendants. For example, it is not clear from the record whether a reasonable officer would have had the same concern about the potential threat Escobedo posed to pedestrians near the building and persons at St. Joseph Hospital. Also, given that the supervisors were not getting all important information about negotiations, it is not clear if a reasonable officer in their position would have concluded that further negotiations were futile and then decided to use force.

The most important of these claimed interests is the issue of the threat or potential threat posed by Escobedo. The Defendants have not cited to any evidence in the record to support the view that Escobedo became more dangerous or threatening as time went on such that police could conclude that the use of force in the form of tear gas suddenly became necessary.

49

Escobedo's comments throughout the incident were a mix of pleas for help, threats of committing suicide, statements indicating he might surrender, and statements that he feared the police. These comments came in a constantly changing mix starting from the 911 call until police ended negotiations. His behavior, too, alternated between better and worse. Ebetino at times heard noises indicating Escobedo was barricading his apartment, but at other times there were noises and comments indicating that Escobedo was removing barricade items. The Defendants have not pointed to any change in comments or behavior near the end of negotiations that precipitated the need to use force.

Escobedo never threatened to shoot at officers or civilians walking on the street below or at other buildings. For all the concern about the threat to the hospital, it is not clear from the record whether Escobedo had a clear line of fire from his window to the hospital. Additionally, the Defendants were unable to establish that they ordered or warned the hospital to shut down or take other protective action, such as moving patients and employees away from windows that faced Escobedo's apartment building.

The reasonableness of firing tear gas munitions into the apartment in order to accomplish the government's interest in getting Escobedo to surrender is further brought into question by the fact that police cut off communication with Escobedo, which made making arrangements to surrender difficult to impossible. Tear gas in general, and particularly at the levels used by the Defendants at this point, make it difficult to speak, as Zelt acknowledged and as Martin experienced later when his mask seal broke. Also, Ebetino was ordered to end his phone conversation with Escobedo as Martin and the others were about to fire the tear gas. Then, Ebetino and other members of the CRT did not take the communication equipment with them

50

when they left the seventh floor. Even though members of the CRT knew when tear gas was going to be used, no one from CRT or ERT obtained gas masks for members of the CRT so they could stay and then reestablish communication despite the fact that nothing occurred to rush the deployment of the gas. Neither did the CRT officers take steps to maintain or reestablish communication once they were away from the tear gas. And since nothing in the record indicates that Ebetino told Escobedo that the police switched phones so Escobedo could call back if the call was terminated, Escobedo had no way of reestablishing contact once Ebetino hung up the phone as gas was being deployed into the apartment. Yet the evidence does suggest that Escobedo did try to reestablish contact with Ebetino: Escobedo called Taylor's cellular phone number, which is the only number he had for the police, several times after police fired the tear gas and began the breach of his apartment.

The Defendants have not offered evidence showing how they were having trouble maintaining the outer perimeter of the scene other than a comment by Bender that some unspecified number of people were getting through. There is no indication of how many people were breaching or trying to breach the perimeter, whether they were putting themselves or others in danger, or what kind of danger there actually was for people getting through the perimeter. There also is no evidence that officers' readiness was deteriorating to the point where police had to act at 8:30 a.m. or any police action after that point would be unsafe. Officers had been at the scene for three hours at most, and there is no evidence about the temperature outside or in the seventh floor hallway at 8:30 a.m. Crouching in an unairconditioned seventh-floor hallway and sitting or standing at the mobile command center may not have been comfortable, but there is no record that officers readiness was actually deteriorating.

There is also a genuine issue of material fact about whether this incident was having an effect on peak traffic flow in the downtown area for two reasons. First, the Defendants are not in complete agreement about this interest. Bender said traffic was increasing, but Zelt said that many if not most people who work downtown had arrived by 8:30 a.m. Second, the Plaintiff's expert, Danaher, stated that he is familiar with downtown traffic patterns and that "traffic in this small city could with minimal hassle and inconvenience be re-routed to allow traffic flow to [be] only slightly restricted by the ongoing situation." (Danaher Affid. ¶ 32.)

Even if the decision to use tear gas at that time or at all was appropriate because of the interests at stake, there is an issue regarding the amount of gas deployed. Danaher said the amount of tear gas was excessive and "the result of an overly tactical approach" that did not fully use the element of time to the advantage of police. The Defendants—including Zelt, who calculated the amount of gas—did not explain why a level of gas twelve times beyond incapacitation level was needed, and the Defendants' expert did not address the claim that the amount of gas was more than necessary.

The issues of fact surrounding the government's interests preclude summary judgment for the Defendants on the claim that the use of tear gas at 8:30 a.m. against a thus-far peaceful but suicidal, armed, barricaded person was excessive.

(b) *Qualified Immunity and Clearly Established Right*

Viewing the facts most favorable to the Plaintiff, Escobedo was not posing a threat to officers or the public, the standoff was only three hours old, and the officers making tactical decisions did not have all the relevant information regarding negotiations. A reasonable officer

in Martin's position would have known that, under the Plaintiff's version of events, firing the

tear gas rounds into the apartment was an excessive use of force.

A number of sufficiently closely analogous cases, including three cases cited by the

Plaintiff, have found the use of chemical agents such as tear gas or mace violates the rights of

non-threatening, non-resisting persons such that the unlawfulness of firing tear gas canisters into

Escobedo's apartment should have been apparent in light of preexisting law. *See Estate of Smith

v. Marasco*, 430 F.3d 140, 151–53 (3d Cir. 2005) (it was unreasonable for officers to decide to

storm suspect's house using tear gas and flash bang grenades); *Knighten v. John*, 180 F.3d 264,

*2 (5th Cir. 1999) (per curiam) (alleging that prison guards used tear gas without cause stated a

claim of a constitutional violation); *Estate of Bryant v. Buchanan*, 883 F. Supp. 1222, 1227 (S.D.

Ind. 1995) (a jury could find that spraying CS gas into the face of a shackled and handcuffed

suspect, along with other force, was "patently violative of the Fourth Amendment," leading the

court to deny the defendant officers qualified immunity.); *Lamb v. City of Decatur*, 947 F. Supp.

1261, 1264  (C.D. Ill 1996) (police denied qualified immunity because it was not necessary to

spray protesters with tear gas); *Adams v. Metiva*, 31 F.3d 375, 387 (6th Cir. 1994) (reversing

summary judgment because a jury could find that officer sprayed mace into the face of a

handcuffed person and "no reasonable officer would believe that such conduct would not violate

plaintiff's constitutional rights); *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (prison

guards' use of tear gas and other weapons against a prisoner "unquestionably crossed the line

separating the necessary force from brutality"); *McCargo v. Mister*, 462 F.Supp 813, 820 (D.Md.

1978) (spraying tear gas into prisoners' cells was unreasonable and violated prisoners' rights);

*Greear v. Loving*, 528 F.2d 578 (4th Cir. 1976) (reversing summary judgment because a jury

53

might find that prison authorities unnecessarily fired tear gas into prisoner's face); *Morris. v. Travisono*, 528 F.2d 856 (1st Cir. 1976) (affirming summary judgment ruling for plaintiff prisoners who claimed prison guards gassed them when they posed no threat).

The defendant argues that most of the cases cited by the Plaintiff—including the three cited above, *McCargo*, *Greear*, and *Morris*—are prison cases and thus distinguishable from this case. Some of the other cited cases above also are prison cases. But that is a distinction without a difference. To find that a right has been clearly established, a court does not have to find "the very action in question has previously been held unlawful." *Miller v. Jones*, 444 F.3d 929, 934 (7th Cir. 2006). It is no surprise that, given the novelty of this case—a standoff that leads to a tactical assault on a person's apartment despite the lack of a hostage, shots fired, threats to police or the public, or some other immediate threat—no very similar case could be found where using tear gas was considered a violation of a person's rights.

The principle underlying the holding in all of the cases cited above is what clearly establishes Escobedo's right not to be subjected to tear gas.  Under the circumstances most favorable to the Plaintiff, Martin and the commanders should have known that firing the tear gas against a person who is not resisting, fleeing, or posing an immediate threat to police or others would violate Escobedo's rights.  That principle applies whether the person refuses police commands to leave his house (*Marasco*), is an unruly protester (*Lamb*), is handcuffed in the back of a police car (*Adams*), or is in a prison cell (a number of the others cited above).

The Court recognizes that excessive force claims by prisoners fall under the Eighth Amendment, not the Fourth Amendment, and as such the analysis of such claims differs. But the courts' findings that prison authorities used excessive force and violated prisoners' constitutional

rights with tear gas in those cases still qualifies as preexisting law that sheds light on what happened on July 19, 2005. Also, the fact that courts have found prison authorities to have violated prisoners' rights with tear gas favors the Plaintiff's position, not the Defendants'. Because of the need to maintain order in a prison, first, authorities have more latitude and discretion to use force than do the police when dealing with a person inside his own home (who, in this case, is not even sought for having committed a crime), and second, prisoners have fewer privacy rights than a person inside his own home. *See generally Soto v. Dickey*, 744 F.2d 1260, 1268–69 (7th Cir. 1984) (stating that federal courts have "adopted a broad hands-off attitude toward problems of prison administration," and administrators have "Herculean obstacles to effective discharge of . . . duties" such as "maintaining internal order and discipline, . . . securing their institutions against unauthorized access or escape, and . . . rehabilitating . . . the inmates"); *Bell v. Wolfish*, 441 U.S. 520, 537, 557 (1979) (stating that prisoners have less privacy, and it is "of a diminished scope"). Accordingly, Martin is not entitled to qualified immunity for shooting tear gas into Escobedo's apartment.

**2.      *Breach of and Entry into Escobedo's Apartment by Means of Flash Bang Grenades and More Tear Gas***

The next use of force by the Defendants is their breach of and entry into Escobedo's apartment and bedroom, including the use of flash bang grenades and additional tear gas. The Defendants involved in this use of force are the entry team[12]: Selvia, its leader, and Martin,

---

[12] The entry team also included Westfield and Lee, but they were dismissed from the case earlier in this litigation at the request of the Plaintiff. *See* DE 34, 40.

Brown, and Straub.[13]

At this point during the incident, the *Graham* considerations are similar to when Martin and others fired the tear gas into Escobedo's apartment. The first factor, the severity of the crime, did not change at this point. Police received no response from Escobedo in word or deed after the tear gas was fired into the apartment (other than perhaps hearing coughing).

As for the second *Graham* consideration, any immediate threat to the officers, that too had not changed. Escobedo had done nothing to indicate that the potential threat he posed had increased, such as firing his weapon in retaliation for the tear gas in his apartment. And because police were no longer communicating with him, the Defendants had no basis to believe that he was a greater danger to himself or others. Thus, the factual evidence in the record does not establish that Escobedo posed an immediate threat to the officers or the public at this point.

The third factor, resistance or flight, has little or no difference at this point. The only possible difference is that a reasonable officer might have viewed Escobedo as showing more resistance at this point in light of the fact that he had not exited the apartment after the initial tear gas deployment, as the Defendants' expert remarked when he referred to "the intransigence of the suspect." (McCarthy Rpt. 10, DE 37-32.) On the other hand, a reasonable officer might also believe that Escobedo had become even more frightened of the police after they shot tear gas into his apartment and, as a result, was hiding; that the significant amount of tear gas made it difficult or impossible for Escobedo to communicate with police in order to arrange his safe and peaceful surrender; or that the tear gas had so incapacitated and/or disoriented Escobedo that he was unable to do anything, including move toward the officers and surrendering. In any event,

---

[13] The Court analyzes any supervisor liability for use of force in C.1.(a), *infra*.

56

the Defendants did not offer any evidence in the record to support a finding that Escobedo had

significantly increased the level of his resistance at this time. In fact, it appeared that Escobedo

was maintaining the status quo.

In light of these considerations, the governmental interest at this point was no different

than it was before police decided to use force in the first place in the form of tear gas . The

interest remained to make Escobedo surrender and to protect officers from any potential harm

during the process. The factors affected by the lapse of time had not changed at this point

because only a few minutes had passed from when tear gas was shot through the windows to the

point when police rammed open his apartment door and threw in more tear gas canisters. The

other governmental interests—controlling the area, the effect on traffic, deteriorating readiness

of officers, the potential threat to pedestrians—have the same problems at this point as they did

when police decided to shoot tear gas through the apartment windows. The governmental

interests were not served by entering the apartment and bedroom with more tear gas and flash

bang grenades. The Defendants did not have to escalate to this next level of force; waiting for a

peaceful surrender was still an option. Instead, the Defendants elected to use force: entering the

apartment and the bedroom while deploying more tear gas as well as flash bang grenades. In

light of the issues of fact surrounding the governmental interests, a jury could find that this level

of intrusion was unreasonable and constituted excessive force, violating Escobedo's rights.

All the Defendants on the entry team were personally involved with and responsible for

this use of force. Selvia, Martin, Brown, and Straub are not entitled to qualified immunity for

this violation of Escobedo's rights for the same reason Martin was not entitled to qualified

immunity for firing tear gas into the apartment windows. In short, the law was clearly

established at that time to put them on notice that unnecessarily entering Escobedo's apartment and bedroom along with the use of more tear gas and flash bang grenades would have, under the Plaintiff's version of events, violated Escobedo's rights.

The Plaintiff in her Response brief also makes reference to a claim against Ebetino for an unreasonable assault on the apartment. This apparently is based on a failure to intervene claim.[14]

> An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Assuming for the moment that Ebetino knew that excessive force was being used when tear gas was fired into the apartment and when the entry team raided the apartment, the facts in the record show that Ebetino did not have the availability of a reasonable amount of time to intervene or a reasonable likelihood of successful intervention. Ebetino was negotiating with Escobedo up until the last minute and focusing his attention on efforts to coax Escobedo into surrendering. Once tear gas was fired into the apartment, Ebetino was overwhelmed by the tear gas and had to flee the seventh floor. By the time Ebetino reached the command center, it would not have been possible for him to return to the seventh floor and somehow stop the entry team from raiding the apartment. Also, given Escobedo's rank as an officer, it is unlikely that his efforts to stop the tear gas or the raid would have been heeded by other officers and higher-ranking personnel.

---

[14] An excessive force claim against Ebetino would fail given that the Plaintiff does not allege Ebetino personally participated in the entry into the apartment and bedroom or in any other use of force against Escobedo. A supervisory liability claim would also fail because the record establishes that Ebetino did not hold a supervisory position such that he had any authority that would subject him to liability under *Chavez v. Illinois State Police*, 251 F.3d 612, 615 (7th Cir. 2001), *see infra* C.1

3.      *Escobedo's Fatal Encounter with Martin and Brown*

Once Martin and Brown were inside the bedroom and came face to face with Escobedo in

the apartment, the circumstances and *Graham* considerations changed dramatically. There is no

factual dispute that Escobedo pointed his gun at Martin. Martin's and Brown's accounts of that

act are consistent. The Plaintiff's only contention about what happened at this moment is the

claim that Escobedo perhaps could not hear or see the officers, so pointing the gun at Martin was

possibly inadvertent.

First, the severity of the crime changed from cocaine possession to threatening an officer

with a deadly weapon. Second, Escobedo at this point finally did pose an immediate threat to a

police officer. Third, moving the gun from his own head and pointing it at Martin constitutes

actively resisting arrest because it prevented Martin or other officers from stepping close enough

to physically secure Escobedo and take him into custody.

These *Graham* factors make clear that the governmental interest at this point is officer

safety, that is, preventing Escobedo from moving his finger on the trigger enough to fire one or

more bullets toward Martin. "[I]f a suspect threatens the officer with a weapon . . . deadly force

may be used if necessary." *Tennessee v. Garner*, 471 U.S. 1, 11 (1964). "Where the suspect

poses no immediate threat to the officer and no threat to others," deadly force is not justified. *Id.*

"When an officer believes that a suspect's actions places him, his partner, or those in the

immediate vicinity in imminent danger of death or serious bodily injury, the officer can

reasonably exercise the use of deadly force." *Sherrod v. Brown*, 856 F.2d 802, 805 (7th Cir.

1988) (en banc) (emphasis omitted). Furthermore, "we have held that if the suspect threatens the

officer with a weapon, the risk of serious physical harm to the officer or others has been

59

established." *Palma v. Edwards*, 103 F. App'x 3, *5 (7th Cir. 2004).

This principle has been applied in the Seventh Circuit many times to vindicate officers facing mortal peril as Martin was here. *See, e.g.*, *Maravilla v. United States*, 60 F.3d 1230, 1233 (7th Cir. 2005) (fatally shooting a man who was firing out of a window during an arrest warrant raid was justified by fear of serious harm to officers inside the house and to officers outside the house). The Seventh Circuit has even found that deadly force was justified against a threatening person in situations where the person did not point a gun at the officer, as was the case here.[15] Also, it does matter whether Escobedo intended to harm or threaten Martin when he pointed the gun at the officer, or if Escobedo could not hear or see Martin and simply moved the gun in Martin's direction without knowing Martin was there, as the Plaintiff suggested. The reasonableness analysis required by *Graham* is an objective one. A reasonable officer would not be able to make such a split-second determination in those conditions and would be justified in using deadly force in self-defense or defense of others.

Accordingly, Martin's initial volley of shots at Escobedo was reasonable and justified and did not violate Escobedo's rights because Martin was defending himself from Escobedo's threatening actions, conduct that put Martin in imminent danger of death or bodily injury.

_____

[15] *Henning v. O'Leary*, 477 f3d 492, 496 (7th Cir. 2007) (deadly force justified against a suspect whose hands at least two officers thought were on or near a loose gun during a struggle); *DeLuna v. City of Rockford, Ill.*, 447 F.3d 1008, 1011–13 (7th Cir. 2006) (fatally shooting person was reasonable when he advanced on officer in a way that prevented the officer from seeing one of his hands despite warnings to stop, said he "had something for" the officer and that the officer would have to shoot him in the chest if he was going to shoot, had a history of violence, was known to carry weapons, and was acting irrationally); *Plakas v. Drinski*, 19 F.3d 1143,1146 (7th Cir. 1994) (fatal shooting was justified when suspect had escaped from a police car, attacked a police officer with a fireplace poker, refused commands to drop his weapon, told officer that one of the two of them would die that night, and advanced on officer with the weapon raised to strike); *Tom v. Voida*, 963 F.2d 952, 962 (7th Cir. 1992) (officer's fatal shooting of suspect was justified because suspect had already severely beaten the officer, she could not subdue suspect by other means, and he was rushing her again even after she fired once); *Ford v. Childers*, 855 F.2d 1271, 1275–76 (7th Cir. 1988) (en banc) (police officer was justified in shooting fleeing bank robber because he reasonably believed the robber was armed and posed a danger of serious harm to others).

Brown's shooting of Escobedo also was reasonable and justified and did not violate Escobedo's rights because Brown was defending Martin from this same conduct that put Martin in imminent danger of death or bodily injury.[16]

     The second volley of shots by both Martin and Brown did not violate Escobedo's rights either. "Police officers cannot be expected to wait until a resisting arrestee has a firm grip on a deadly weapon . . . before taking action to ensure their safety." *Henning*, 477 F.3d at 496. *See also Muhammed v. City of Chi.*, 316 F.3d 680, 683 (7th Cir. 2002) (summary judgment for officer's second round of shooting suspect was appropriate when there was nothing to contradict officer's statement). Escobedo's gun dropped into this lap or between his legs, and Martin observed what he believed was Escobedo reaching down and leaning forward to pick up the gun. Brown too said it looked like Escobedo was reaching for the gun. There is no factual dispute about these observations. It was reasonable at this point for Martin and Brown to believe that Escobedo was trying to pick up the gun so he could point it at Martin or Brown and fire it. Accordingly, both Martin's and Brown's second volley of shots were reasonable and justified.[17]

## C.    Other Claims

### 1.    *Liability of Supervisory Officers*

     The Plaintiff argues that the supervisory officers—Bender, Zelt, Hunter, and

---

[16] The Court does not need to decide if Brown used lethal or less-than-lethal force when he fired the beanbag rounds from the Sage weapon because Brown admitted that, at the range he fired the weapon, it was lethal force. If firing the weapon was considered less-than-lethal force, it would be justified and reasonable in light of the conclusion that lethal force at the moment was justified.

[17] Insofar as there was any supervisory liability claim against Selvia under *Chavez v. Illinois State Police*, 251 F.3d 612, 615 (7th Cir. 2001) for ordering Brown (or Martin) to fire, such a claim would also be dismissed in light of the conclusions that lethal force was justified and there was no underlying constitutional violation in shooting Escobedo.

Lucker—also are liable for the violations of Escobedo's rights. The Plaintiff discusses two forms of liability that can be read from her complaint: first, general supervisory liability for their direct orders to use force against Escobedo, (DE 49 at 69), and second, liability for failure to train the subordinate officers to handle situations involving suicidal, mentally ill persons (DE 49 at 69).

(a) *Supervisory Liability*

The Plaintiff argues that Hunter, Zelt, Bender, and Lucker—when they conferred with each other and then ordered the tear gas assault and subsequent raid on the apartment—through their acts and omissions displayed a reckless or callous indifference to Escobedo's constitutional rights, and, in fact, caused their subordinates to violate his rights. The Defendants argue that the decisions and actions of the supervisors were reasonable under the circumstances.

"Section 1983 creates a cause of action based upon person liability and predicated on fault." *Wolf-Lillie v. Sonquist*, 699 F.2d 864, 869 (7th Cir. 1983). An individual can only be held liable if he "caused or participated in an alleged constitutional deprivation." *Id.* Accordingly, courts have rejected § 1983 claims attempting to hold a supervisor liable for the conduct of a subordinate on the basis of *respondeat superior. Id.*

> Supervisory liability will be found, however, if the supervisor, with knowledge of the subordinate's conduct, approves of the conduct and the basis for it. That is, to be liable for the conduct of subordinates, a supervisor must be personally involved in that conduct. Supervisors who are merely negligent in failing to detect and prevent subordinates' misconduct are not liable. . . . The supervisors must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see. They must in other words act either knowingly or with deliberate, reckless indifference.

*Chavez v. Ill. State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (citations, quotation marks, and brackets omitted) (ellipsis in original). "A causal connection, or an affirmative link, between the

62

misconduct complained of and the official sued is necessary." *Wolf-Lillie*, 699 F.2d at 869.

Here, the Plaintiffs have presented sufficient evidence to present to a jury that Bender, Zelt, Hunter, and Lucker directed, approved, or condoned the conduct that caused a constitutional violation, or, at the very least, that it occurred with their knowledge or consent. This is not a case where the supervisors are merely charged with being negligent in discovering their subordinates' actions. They personally took part in the events of July 19, 2005.

Bender made the final decision to use force against Escobedo, first by firing tear gas into the apartment, and second by sending the entry team into the apartment. Zelt proposed the specific course of action, concurred with Bender's decision, and also gave specific orders to the ERT and entry team throughout the standoff. Even though Hunter supervised only the CRT, his knowledge of the plan and concurrence in Bender's decision means he "approve[d] it [and] condone[d] it." *Chavez*, 251 F.3d at 651.

Lucker's liability is a closer call. The Defendants argue that Lucker did not make the final decision and was not part of the decision-making process. Under *Chavez*, however, liability can attach even if a supervisor is not part of the decision-making process. Lucker admitted that he participated in the discussion with Bender, Zelt, and Hunter about the use of force, and Lucker in his testimony recounted the details of the factors that the supervisors considered to determine whether to use force against Escobedo to end the standoff. The Defendants' answers to the Plaintiff's interrogatories stated that Lucker participated and was involved in the decision to use tear gas. Bender said that he consulted with Lucker about using tear gas and raiding the apartment, and that, when he made the final decision, "Lucker agreed with me." Hence, Lucker was aware of what the plan was and the fact that it would take place. *See Smith v. Rowe*, 761

F.2d 360, 369 (7th Cir. 1985) ("Like the sheriff in *Wolf-Lillie*, [the defendant] knew of the actions of his subordinates which resulted in a constitutional violation. Also, both failed to take any preventive action."). Lucker may not have facilitated the plan to use force against Escobedo, but a jury could find that he approved the plan by agreeing with Bender or that he condoned it by not voicing concern or objection or by not proposing delay or an alternative course of action. Lucker's rank is also a factor here. Lucker held the same rank as Bender. Even though Bender was the scene commander, Lucker certainly had the authority and stature to raise concerns with a peer (Bender) and two subordinates (Hunter and Zelt) about the actions of other subordinates (the entry team).

Accordingly, all four supervisory officers are not entitled to summary judgment for the excessive force claims where a jury could find that police violated Escobedo's rights: when Martin, as ordered, fired tear gas into the apartment, and when the entry team, as ordered, breached the apartment and bedroom with tear gas and flash bang grenades.

(b) *Failure to Train*

In addition to pointing to these supervisors' direct orders, the Plaintiff contends that "their actions also subject them to an alternative theory of supervisory liability based on their failure to train or supervise their subordinate officers in a way that was very likely to violated Escobedo's constitutional rights." (DE 49 at 69.) The Plaintiff points to the supervisors "haste, loud weapons, and overtly aggressive tactics in response to a lone and suicidal, non-homicidal, and mentally-disturbed man." (*Id.*) She argues that the supervisors "armed their subordinates with tear gas launchers and ordered such a large amount to be deployed that one would later

describe it as being twelve times as much as necessary." (*Id.*) Other actions that the Plaintiff points to are the instructions to cut off negotiations, sending in tactical officers with more gas and flash bang grenades that they were "obviously untrained" how to deploy. (*Id.*) The Defendants argue that the Plaintiff has not satisfied the stringent burden of establishing a need for training, or that there is a causal connection between any lack of training and Escobedo's injury.

The Plaintiff's brief is completely devoid of any case law in support of this alternative theory of liability against the supervisors as individuals. *See Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001) (noting that "failure to train claims are usually maintained against municipalities, not against individuals"). Nor does the Plaintiff designate any evidence that the training was deficient. The Plaintiff simply relies on the results of the subordinates' actions to infer that the training was inadequate.

The Defendant correctly points out that the Seventh Circuit has ruled that "failing merely to instruct police on the handling of dangerous people who appear to be irrational cannot amount to deliberate indifference" unless some other circumstances are present, *Pena v. Leombruni*, 200 F.3d 1031, 1033 (7th Cir. 1999) (ruling that defendant sheriff was not liable for failing to issue instructions for dealing with insane persons), such as not training employees about "a clear constitutional duty implicated in recurrent situations that a particular employee is certain to face . . . or after learning of a pattern of constitutional violations involving the exercise of police discretion." *Robles v. City of Fort Wayne*, 113 F.3d 732, 735 (7th Cir. 1997) "Under either scenario, the finding of deliberate indifference is derived from the City's failure to act in the face of actual or constructive notice that such a failure is likely to result in constitutional

deprivations." *Id.* (internal quotations omitted). The Plaintiff has not pointed to any factual information in the record to support the contention that the supervisors had notice of likely constitutional deprivations. Morever, the Defendants' deposition testimony includes discussion of training they received and conducted dealing with disturbed individuals.

**2.      *Fourth Amendment Claim for Warrantless Entry***

The Defendants stated in a footnote in their motion for summary judgment that the Plaintiff brought only excessive force claims against the Defendants and had raised no claim that officers' warrantless entry into Escobedo's apartment violated his constitutional rights. In response, the Plaintiff asserts that the Defendants "are wrong in believing that this claim is not encompassed in the present action." (DE 49 at 41.) One of the theories of liability that the Plaintiff asserts in her response to the Defendants' motion for summary judgment is that the supervisory officers, Hunt, Zelt, Bender, and Lucker, and the entry team, consisting of Martin, Brown, Straub, and Selvia, violated Escobedo's constitutional rights when the entry team physically entered Escobedo's apartment without a warrant. In their reply, the Defendants' maintain their position that the Plaintiff's complaint cannot be read to assert a claim for unlawful entry in violation of the Fourth Amendment. In the alternative, they argue that exigent circumstances justified their entry, and that they are entitled to qualified immunity.

The Plaintiff's Complaint details the events of July 19, 2005, beginning with Escobedo's 911 call and ending with his death. The Complaint then sets forth the causes of action that the Plaintiff is pursuing as a result of the events of July 19, 2005. The first is a federal claim pursuant to 42 U.S.C. § 1983 against individual defendants. Paragraph 77 states that "Defendants

66

Martin, Brown, Westfield, Straub, Ebetino, Lee, [and] Selvia's use of force in detaining and seizing the decedent was excessive and violated Mr. Escobedo's constitutional rights." (Compl. ¶ 77.) The next paragraph alleges that the Defendants supervising the officers named in paragraph 77 caused the violation of Escobedo's constitutional rights by their knowing, willful, reckless, and deliberate indifference to the constitutional violations caused by those officers. (Compl. ¶ 78.) The Plaintiff alleges that the Defendants were acting under color of law and in the scope of their employment and that their "unlawful conduct was the proximate cause of death of Rudy Escobedo." (Compl., ¶¶ 79, 80.)  Under the only other cause of action listed in the Complaint, the Plaintiff seeks damages from the City of Fort Wayne under Indiana state law for Escobedo's death. (Compl., ¶¶ 81–82; prayer for relief.)

The Plaintiff argues that the claim for warrantless entry is included in the federal cause of action set forth in the Complaint. That claim specifically refers to the excessive "use of force in detaining and seizing the decedent" and to Escobedo's death. It is reasonable to infer that the entry, including the use of chemical agents and flash bang grenades, is included in this claim for excessive force. It is more questionable whether the fact that the entry was without a warrant can reasonably be included in the claim—which is designated as one for "use of force." It is also unlikely that the Plaintiff is claiming that the fact that the entry was without warrant was one of the proximate causes of Escobedo's death, as there is no indication that obtaining a warrant to justify the entry would have altered the manner of entry.

Thus, it is a close call whether the Defendants were on notice that the litigation involved not only their use of force during their seizure of Escobedo, including the entry into his apartment, but also that their entry was without a warrant. However, because the Complaint

includes the necessary factual elements of such a claim—warrantless entry into a home—and
because the Plaintiff invokes § 1983, the Court will read the Complaint broadly to include a
claim for warrantless entry into the home.

The Defendants argue that even if the Complaint is read to assert a claim for unlawful
entry, the Defendants were justified in entering without a warrant due to exigent circumstances.
They further argue that, even if the Court finds that their entry was unlawful, they are entitled to
qualified immunity. The Plaintiff argues that no exigent circumstances existed because the
Defendants were on the scene for several hours before deciding to enter the apartment. She
argues that at any point during this time, an officer could have been dispatched to obtain a
warrant.

(a) *Was Warrantless Entry a Violation of Escobedo's Constitutional Rights?*

A police officer's entry into a home without a warrant is presumptively unconstitutional
under the Fourth Amendment, *Leaf v. Shelnutt*, 400 F.3d 1070, 1081 (7th Cir. 2005), but
warrantless entry is permissible if exigent circumstances exist. *Id.* Exigent circumstances exist
when there is a compelling need for official action and no time to secure a warrant. *United States
v. Arch*, 7 F.3d 1300, 1304 (7th Cir. 1993). For example, exigent circumstances are present when
the police reasonably fear for the safety of someone inside the premises. *Leaf*, 400 F.3d at 1081.
A court must analyze the situation from the perspective of the officers on the scene. *United
States v. Marshall*, 157 F.3d 477, 482 (7th Cir. 1998).

Here, it is undisputed that Escobedo called 911 stating that he had a gun to his head, that
he had taken cocaine, and that he had refused to leave the apartment, saying both that he would

kill himself and that he did not want to die. Escobedo also claimed that police were already in his apartment when they were not. The Defendants maintain that entering a house to assist a suicidal or mentally ill person is justified by exigent circumstances. However, neither party points to a case that establishes these factors as creating the necessary exigency to forego the requirement of a warrant. In *Estate of Bing v. City of Whitehall*, a case from the Sixth Circuit, the occupant was not only believed to be suicidal, but also homicidal. 456 F.3d 555 (6th Cir. 2006). In *Bing*, the court found that the following facts supported the conclusion that a dangerous exigency justified entry into Bing's home without a warrant:

> (1) Bing discharged a firearm near neighborhood minors; (2) Bing continued to have access to a gun inside the house; (3) the police had been called to Bing's residence on previous occasions because he previously had fired shots; (4) the police could see Bing move from room to room, demonstrating that police and bystanders were probably within range of Bing's gun; (5) people in the street reported that Bing appeared intoxicated, making it reasonable to expect that he would act unstably; (6) a crowd was gathered in the street near Bing's house, and people in the neighborhood refused to evacuate. In other words, Bing had shown a willingness to fire weapons in his neighborhood and could have harmed others in an instant with little effort. Therefore, a dangerous exigency existed.

*Bing*, 456 F.3d at 564 (holding that these facts demonstrated that suspect had a willingness to use a weapon). In *Bing*, the court also addressed the passage of time, holding that it did not terminate the exigency. The court reasoned, that "the ticking of the clock did nothing to cut off Bing's access to his gun, or cure him of his willingness to fire it, or move to safety the people nearby who refused to evacuate." *Id.* at 565 (stating that exigent circumstances terminated when factors creating the exigency are negated).

Although Escobedo had access to a gun and his apartment was located in a populated area, one major factor distinguishes this case from *Bing.* Unlike in *Bing*, the Defendants do not point to anything indicating that it was reasonable to expect that Escobedo would become

homicidal. He had not shot his gun or threatened to shoot his gun, except to kill himself. Nor did

he show himself at the apartment windows, thereby demonstrating that any bystanders were

within his range. Additionally, snipers were observing the windows of his apartment. Thus,

while the Court does not believe that the mere passage of time is sufficient to negate factors that

create exigency, the exigency must have existed in the first place.

In response to that point, the Defendants argue that "[a]ttempting to provide assistance to

and rescue a suicidal person constitutes exigent circumstances." (DE 72 at 25.) The Defendants

note that, in *Russo v. City of Cincinnati*, 953 F.2d 1036, 1044 (6th Cir. 1992), the court stated:

"Plaintiffs fail to cite a single case indicating that an officer's attempt to rescue what that officer

believes to be a suicidal person does not constitute exigent circumstances, nor are we aware of

such precedent." However, this statement was made not to establish that a suicidal person creates

exigent circumstances but to highlight that it was not clearly established that exigent

circumstances did not exist to assist a suicidal person. 953 F.2d at 1043–44 (granting qualified

immunity to officer who entered apartment without warrant to seize mentally disturbed, suicidal

person who had two large knives in his possession and had fallen silent).

For her part, the Plaintiff concentrates on the passage of time as evidence that no

exigency existed to enter Escobedo's apartment. But as the Court already stated, arguments

about the passage of time are secondary to determining whether exigency existed in the first

place. The passage of time only has relevance to the extent it affects the factors that created the

exigency.  For example, if exigency existed by virtue of Escobedo's suicidal threats and the

means to carry them out, the time spent devising a plan and attempting to deal with the situation

did not negate the exigency any more than the passage of time negated the danger present in

70

*Bing*. There is no evidence that Escobedo no longer had a gun, was becoming more rational, or that his threats took on a less serious tone as time was spent trying to negotiate with him such that any exigency created by his suicide threats dissipated with time.

However, whether a threat of suicide is an exigent circumstance, and under what circumstances, remains unclear. Assuming that such a threat can create exigent circumstances, the Court finds that genuine issues of fact remain regarding the danger that Escobedo presented to himself, particularly whether it was so imminent that there was no time to secure a warrant. Ebetino stated that he did not feel that it was imminent that Escobedo would commit suicide, but that, each time Escobedo mentioned suicide, Ebetino became more fearful that it would happen. The officers knew that Escobedo was under the influence of cocaine and that his thoughts were not rational. However, they also knew that Escobedo said that he did not want to die and that he was building a rapport with Ebetino.

Assuming for purposes of summary judgment that the police were not reasonable to believe that they did not need a warrant to enter Escobedo's apartment, the Plaintiff must still establish that the right was clearly established to defeat the Defendants' claim of qualified immunity.


(b) *Qualified Immunity and Clearly Established Right*

To defeat the Defendants' claim for qualified immunity, the Plaintiff must show that, under clearly established law, exigent circumstances did not exist that would justify the officer's forcible entry into Escobedo's apartment. The Supreme Court has said that the right must be established in a "particularized" sense. *Anderson*, 483 U.S. at 640 (holding that the contours of

71

the right must be sufficiently clear that a reasonable officer would understand that what he is doing violates that right); *see also Saucier*, 533 U.S. at 201–02 (stating that the relevant inquiry is "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"). The Plaintiff does not cite any case indicating that a suicidal person, like Escobedo, does not create exigent circumstances. Nor does she point to any closely analogous case.

The Plaintiff's failure to point to any such case highlights that the law was not clear that a warrant was required to assist, through entry into his home, a person in Escobedo's situation. A reasonable officer could not anticipate that a court might decide that exigent circumstances do not exist when the occupant of a dwelling is suicidal and in an impaired frame of mind. Even taking the events most favorable to the Plaintiff, and assuming that the Defendants were mistaken that they did not need a warrant, the Defendants are entitled to qualified immunity because their decision was reasonable. Stated differently, it would not have been apparent that entering Escobedo's apartment under the circumstances of this case violated his Fourth Amendment rights; the right of an impaired and suicidal person to be free from warrantless police entry into their dwelling was not clearly established. Qualified immunity is intended to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341(1986). Therefore, the Defendants are immune from the Plaintiff's § 1983 claim for their warrantless entry into Escobedo's apartment.

3.      *Due Process Claim*

In her surreply, the Plaintiff asserts a theory of liability not previously mentioned or advanced in this litigation. The Plaintiff argues that the facts establish that the Defendants intentionally cut off all communication with Escobedo after the tear gas was fired into the apartment and did not respond to calls that Escobedo made to cellular phone number of the first negotiating officer, Taylor. The Plaintiff submits that this violated the Defendants' own standard protocol and was egregious conduct that shocks the conscience. The Plaintiff contends that this willful indifference to Escobedo's safety and his life is a substantive due process violation that can be pursued through § 1983.

The Defendants argue that there are several flaws in the Plaintiff's theory that entitles them to summary judgment. First, the Plaintiff's reliance on Escobedo's unanswered attempts to call the negotiator is explained, not by officers' deliberate indifference to Escobedo, but by the fact that Escobedo did not call the telephone being used for negotiations at the time when the gas was introduced into the apartment, and by the fact that all communication equipment was abandoned on the seventh floor when the officers without gas masks had to leave the area. The Defendants also submit that a failure to comply with standard operating procedure does not rise to the level of a constitutional violation. The Defendants note that the Plaintiff's claim is not properly before the Court, having never been alleged in a pleading, but that even if it is considered, it fails on the merits because Escobedo himself, and not any affirmative action by the Defendants, created the danger.

The Court finds that another reason precludes the Plaintiff's due process claim. The Constitution's requirements for arrests and seizures appear in the Fourth Amendment. Because a

73

specific constitutional amendment governs the Plaintiff's claim that the Defendants' seizure was unlawful and unreasonable, the Plaintiff cannot assert a substantive due process claim. *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (holding that a claim of abusive governmental conduct that implicates a specific constitutional right must be analyzed as a violation of that right, rather than as a violation of substantive due process). In *Graham*, the Court explicitly stated that *"all* claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach." 490 U.S. at 395. The Plaintiff's attempt to isolate certain state action, or inaction, that arose during the course of the Defendants' seizure of Escobedo and analyze it as a substantive due process claim is improper. While ending communication with Escobedo and not reestablishing it is not itself a "seizure," it is alleged to be actionable because it occurred in the context of a seizure. Without the seizure, the failure to answer the Plaintiffs' phone calls would not be an issue. Thus, as discussed earlier, ending communications is part of the totality of circumstances in the Court's consideration of whether the use of force in this case was reasonable, but it is not in and of itself actionable as a due process claim.

**4.      *Wrongful Death Action—Indiana Law***

The Plaintiff asserts a wrongful death claim against the City of Fort Wayne pursuant to Indiana Code § 34-23-1-2, the Indiana Tort Claims Act (ITCA). This is the only claim brought against the City.

The Defendants assert that the Plaintiff's wrongful death action is barred because she did not comply with the notice provisions of the ITCA. The Plaintiff argues that Indiana recognizes "substantial compliance" where the purposes of the notice provisions have been satisfied. She contends that the purposes of the statute were satisfied in this case through communication from the Plaintiff's counsel to the Mayor of Fort Wayne, the Allen County Coroner, the Allen County Prosecutor, and the filing of a lawsuit—all of which informed the city officials of the time, place, cause, and nature of the tort, as well as the nature and extent of the injuries, so the that City could investigate, determine its liability, and prepare a defense. The Plaintiff maintains that there is ample evidence that the City was aware of the claims and investigated them during the statutory notice period.

(a) *ITCA Notice Requirement*

The ITCA governs tort claims against governmental entities, such as the City of Fort Wayne. Under the ITCA, a claim against a political subdivision is barred unless notice is filed with the governing body of the political subdivision and with the Indiana political subdivision risk management commission, if applicable, within 180 days after the loss occurs. Ind. Code § 34-13-3-8. Because Escobedo's death occurred on July 19, 2005, the 180-day notice period ended on January 15, 2006.

The statute also prescribes the form and contents of the notice:

The notice . . . must describe in a short and plain statement the facts on which the claim is based. The statement must include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of the damages sought, and the residence of the person making the claim at the time of the loss and at the time of filing the notice.

75

Ind. Code. § 34-13-3-10. The notice must be in writing and delivered in person or by registered or certified mail. Ind. Code § 34-13-3-12. The governmental entity then has 90 days to approve or deny the claim, Ind. Code § 34-13-3-11, and a plaintiff "may not initiate a suit against a governmental entity unless the person's claim has been denied in whole or in part," Ind. Code § 34-13-3-13.

In their answer to the complaint, the Defendants allege the Plaintiff's failure to comply with the notice requirements as an affirmative defense. The Plaintiff does not dispute that she did not submit the written notice described in the statute to the City's governing body. Generally, the failure to comply with the requirements of the notice statute will subject a claim to summary dismissal. *Allen v. Lake County Jail*, 496 N.E.2d 412, 414 (Ind. Ct. App. 1986). However, Indiana courts have advanced a liberal application of the requirements of the ITCA notice statute "in order to avoid denying plaintiffs an opportunity to bring a claim where the purpose of the statute has been satisfied." *Brown v. Alexander*, 876 N.E.2d 376, 381 (Ind. Ct. App. 2007). Not all technical violations of the statute are fatal to a claim; non-compliance has been excused based on the theory of substantial compliance, which "focuses on the nature of the notice itself, and is concerned with the extent to which the form, content, and timing of the notice given by a plaintiff complies with the statutory requirements" of the notice statute. *Allen*, 496 N.E.2d at 415.

The parties' dispute regarding the notice requirement is question of law for the court. *See Brown*, 876 N.E.2d at 380 ("Compliance with the ITCA is a question of law and properly determined by the court."). The Plaintiff bears the burden of establishing substantial compliance.

*Id.* at 384; *Irwin Mortg. Corp. v. Marion County Treasurer*, 816 N.E.2d 439, 446 (Ind. Ct. App. 2004).

(b) *Substantial Compliance*

The rationale for substantial compliance was set forth by the Indiana Supreme Court in *Galbreath v. City of Indianapolis*, 255 N.E.2d 225, 229 (Ind. 1970). "Substantial compliance was adopted to prevent the notice statute from becoming a trap for the unwary." *Brown*, 876 N.E.2d at 382 (citing *Galbreath*, 255 N.E.2d at 229 and *Porter v. Fort Wayne Cmty. Schs.*, 743 N.E.2d 341, 344 (Ind. Ct .App. 2001)). Generally, an evaluation of substantial compliance looks not at the information held by the governmental entity, but to the efforts the claimant made to notify the governmental entity of a claim. *Brown*, 976 N.E.2d at 382. Thus, an action may proceed "when a claimant has attempted to provide notice, has fallen short of the strictures of the statute, and yet has supplied the appropriate governmental entity with sufficient information to investigate the claim." *Id.* (citing *Howard County Bd. of Comm'rs v. Lukowiak*, 810 N.E.2d 379, 382 (Ind. Ct. App. 2004)).

A court should not find substantial compliance where a claimant has not taken affirmative steps to comply with the notice statute, even where the governmental entity knows about its tortious actions and is clearly at fault. *Brown*, 976 N.E.2d at 383. Likewise, independently acquired knowledge or routine investigation of an event is not sufficient to show substantial compliance with the notice statute. *Id.* at 382–83 (holding no substantial compliance even when city power and light company and its claim representative were aware of automobile accident and resulting injuries, investigated the accident, settled the property damage portion of

77

the claim, and engaged in discussions with the claimant where the claimant did not take any steps to comply with notice statute); *Fowler v. Brewer*, 773 N.E.2d 858, 864 (Ind. Ct. App. 2002) (holding that volunteer firefighter's actual knowledge of automobile accident did not satisfy notice requirement); *Coghill v. Badger*, 418 N.E.2d 1201, 1205 (Ind. Ct. App. 1981) (stating that agency's routine investigation of an occurrence did not show substantial compliance because purpose of notice requirement is to enable governmental body to inquire into the occurrence in the context that another is claiming municipal liability for the injury). In *Orndorf v. New Albany Housing Authority*, the plaintiffs argued that they substantially complied with the ITCA's notice requirements because the governmental entity was immediately aware of the incident resulting in the claimant's injuries, investigated the incident, and expressed concern over possible litigation. 843 N.E.2d 592, 596 (Ind. Ct. App. 2006). The court disagreed, reasoning that the plaintiffs could not rely on the defendant's own knowledge of, and presence at, the incident to claim that they substantially complied with the ITCA's notice requirements. *Id.*

Thus, to show substantial compliance, it is not enough to point to the Defendants' knowledge of Escobedo's death and to the police department's own investigation into the matter. The Plaintiff must establish that she initiated contact with the City or otherwise made attempts to provide the required notice within the requisite time frame provided in the statute. Further, this communication must have satisfied the purpose of the notice statute: it must have informed the state officials with reasonable certainty of the incident and surrounding circumstances so that the state could investigate, determine its possible liability, and prepare a defense. *Fowler*, 773

N.E.2d at 863. Any such notice, in order to qualify as substantial compliance, must also advise of

the claimant's intent to assert a tort claim. *Id.* In sum, Indiana law states that:

> In general, a notice filed within the required time period, that informs the municipality of
> the claimant's intent to make a claim, and contains sufficient information which
> reasonably affords the political subdivision an opportunity to promptly investigate the
> claim will satisfy the purpose of the statute and will be held to substantially comply with
> the statute.

*Irwin Mortg. Corp.*, 816 N.E.2d at 446 (citing *Howard County Bd. of Comm'rs v. Lukowiak*, 810

N.E.2d 379 (Ind. Ct. App. 2004)).

The Plaintiff points to several affirmative steps that she argues demonstrate her

substantial compliance with the ITCA's notice provisions. The Plaintiff first points to the lawsuit

itself, filed on December 20, 2005, as evidence that she communicated the Plaintiff's tort claim

to the Defendants. However, pursuant to Indiana case law, the filing of a complaint is not

sufficient notice under the provisions of the ITCA. *Kantz v. Elkhart County Hwy. Dept.*, 701

N.E.2d 608, 616 (Ind. Ct. App. 1998) (affirming summary judgment where the plaintiff did not

provide notice of claim before filing suit within 180 days of his injuries). In *Kantz*, the court

noted that the statute prohibits a person from filing suit against a governmental entity until the

governmental entity has denied a notice of tort claim. *See* Ind. Code § 34-13-3-13 ("A person

may not initiate a suit against a governmental entity unless the person's claim has been denied in

whole or in part."). Thus, the legislature intended the notice of claim and the complaint to be two

separate documents, and "a complaint alone could not satisfy the notice provisions of the ITCA."

701 N.E.2d at 616.

Next, the Plaintiff notes, without any citation to the record, a press conference that

Escobedo's family held, a part of which was broadcast on television and reported in Fort Wayne

area newspapers. A press conference certainly does not meet the statutory requirements for form, and the Plaintiff presents no evidence of the content of the press conference. *See Fowler*, 773 N.E.2d at 864 (analyzing each communication according to the standard of the statute with respect to form and content). According to the statute, the notice must include the following information in a plain and short statement: (1) the circumstances that brought about the loss; (2) the extent of the loss; (3) the time and place the loss occurred; (4) the names of all persons involved if known; (5) the amount of the damages sought; and (6) the residence of the person making the claim at the time of the loss and at the time of filing the notice. Ind. Code § 34-13-3-10. The Plaintiff has not demonstrated that the press conference substantially complied with the content requirements of the statute. Neither did it meet the form of a written notice delivered in person or by registered or certified mail. There is nothing in the record to indicate that the press conference was an attempt by the Plaintiff to provide notice that simply fell short of the ITCA's strictures.

The Plaintiff also points to the Plaintiff's counsel's January 3, 2006, contact with the Mayor of Fort Wayne, in which he conveyed concern about the City's response to Escobedo's 911 call. There is no indication that this "contact" was in writing, contained the information required by the statute, or advised the City of the Plaintiff's intent to pursue a tort claim. Again, because the Plaintiff offers no citation to designated evidence in support of this contact, the Court cannot determine that counsel's conveyance of concern was akin to providing notice of a tort claim.

The Plaintiff states that before this, on August 26, and September 1, 2005, the Plaintiff's counsel sent letters to the Allen County Coroner seeking information. Before that, on August 5,

he sent letters to the Allen County Prosecutor. Again, there is no indication that these letters, which sought information from the coroner, the Indiana State Police, and the Fort Wayne Police Department, attempted to inform the governing body of the City of Fort Wayne of a tort claim involving Escobedo. There is no evidence before this Court that these letters, which are mentioned without citation to designated evidence, met the statutory standard for form and content. The Plaintiff has not represented that she informed the City of a tort claim, much less stated the amount of the damages sought. The Plaintiff's letters did not supply the government with sufficient information to investigate a wrongful death claim. By the Plaintiff's own admission, the purpose of the letters was to gather information, not to provide notice of a claim.

The Plaintiff's communication with various entities did not substantially comply with the form or content requirements of the notice statute. And while a writing is not always necessary for substantial compliance, neither has the Plaintiff presented evidence of ongoing correspondence and negotiations between the Plaintiff and the City or its agents regarding a potential claim. This lack of settlement talk sufficiently distinguishes this case from *City of Tipton v. Baxter*, 593 N.E.2d 1280 (Ind. Ct. App. 1992). In *Baxter*, the city's insurer had actual knowledge of the accident within days, conducted an investigation, indicated a willingness to settle, and took affirmative steps toward resolution of a claim. *Id.* at 1284. Here, there was no discussion of a potential resolution of any claim. The only communication from the government that the Plaintiff mentions is a response to a public documents request that includes a thirty-seven-page report entitled "Fort Wayne Police Department—Investigative Division." The report, according to the Plaintiff, was an investigation into the events and circumstances leading to Escobedo's death. There is no evidence that the police department's investigation was in

response to any notice submitted by the Plaintiff. As the Court state above, the Fort Wayne

Police Department's actual knowledge of the events surrounding Escobedo's death, and its own

internal investigation, does not eliminate the requirement that the Plaintiff give notice under the

ITCA. *Brown*, 976 N.E.2d at 384; *Fowler*, 773 N.E.2d at 865; *Coghill*, 418 N.E.2d at 1205.

> In cases of sovereign immunity, it is difficult to strike the proper balance between the right of the sovereign to set the parameters of its immunity waiver and the social desirability of spreading the injured party's loss to those who are responsible for negligent actions. The ITCA attempted to strike this balance by operating as an unequivocal statement of a political subdivision's consent to be sued in tort provided certain qualifications are fulfilled. These qualifications are not onerous. A claimant must provide notice of a claim and allow the governmental entity to approve or deny the claim.

*Brown*, 876 N.E.2d at 383 (internal citation omitted). The purpose of the statute has not been

satisfied, and the City is entitled to dismissal of the wrongful death action brought against it. As

this is the only claim that the Plaintiff brought against the City, it is dismissed from this suit.


## CONCLUSION

For the foregoing reasons, the Defendants' Motion for Summary Judgment is GRANTED

IN PART and DENIED IN PART. Defendants Ebetino and the City of Fort Wayne are

DISMISSED from this case. The excessive force claims against Martin and Brown for the fatal

shooting of Escobedo are DISMISSED. The following claims also are DISMISSED: failure to

train, warrantless entry, substantive due process, and wrongful death under state law.  The

following claims against the following Defendants remain pending for resolution at trial, set and

reaffirmed for December 1, 2008: the excessive force claim against Martin for firing tear gas into

Escobedo's apartment; the supervisory liability claim against the supervisors—Bender, Lucker,

Zelt, and Hunter—for the tear gas fired into the apartment; the excessive force claim against the

82

entry team—Selvia, Martin, Brown, and Straub—for the raid on the apartment and bedroom with tear gas and flash bang grenades; and supervisory liability claim against the supervisors—Bender, Lucker, Zelt, and Hunter—for the entry team's raid.

So ORDERED on May 5, 2008.

  s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

83