# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| ESTATE OF RUDY ESCOBEDO (Deceased) | ) | |
| (Raquel Hanic, Personal Representative of Estate), | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:05-CV-424-TLS |
| | ) | |
| LIEUTENANT KEVIN HUNTER, | ) | |
| LIEUTENANT KEVIN ZELT, | ) | |
| DEPUTY CHIEF MARTIN A. BENDER, and | ) | |
| DEPUTY CHIEF DOUGLAS A. LUCKER, | ) | |
| each in his individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This case involves a July 2005 incident involving the Fort Wayne Police Department and Rudy Escobedo (Escobedo), which ultimately resulted in Escobedo's death. In December 2005, his estate filed suit against some of the officers who participated in the incident. The case is currently before the Court on the Defendants' Motion for Judgment as a Matter of Law [ECF No. 198], which the Defendants presented during the trial at close of the Plaintiff's case-in-chief on February 11, 2011, and renewed at the close of all of the evidence and again after the jury returned its Verdict.[1] The Court took the Defendants' Motion under advisement as it pertains to qualified immunity to allow adequate time to review the complex and factually intensive nature of the qualified immunity issue in this case. The Court will grant the Defendants' Motion and direct the Clerk to enter judgment in their favor.

---

[1] The Court is ruling on the Defendants' Motion for Judgment as a Matter of Law, which they properly preserved and renewed at trial. In ruling on the Motion, the Court has before it the trial record, not the more limited record that was presented at the summary judgment phase. *See Ortiz v. Jordan*, 131 S. Ct. 884, 893 (2011) (holding that a Defendant must raise qualified immunity in a Rule 50 motion to preserve the issue for ruling after the jury's decision on liability).

# BACKGROUND

On December 20, 2005, the Plaintiff filed a Complaint [ECF No. 1] naming the City of Fort Wayne and certain members of the Fort Wayne Police Department, in their individual capacities, as Defendants: Martin Bender, Douglas Lucker, Kevin Hunter, Kevin Zelt, Brian Martin, Jason Brown, Scott Straub, Bernard Ebetino, Derrick Westfield, Shane Lee, and Tim Selvia. The Complaint alleged claims under 42 U.S.C. § 1983 and a state law claim under the Indiana Tort Claims Act. On May 5, 2008, the Court issued an Opinion and Order [ECF No. 111] granting in part and denying in part the Defendants' Motion for Summary Judgment. The Court denied the Defendants' Motion for Summary Judgment as it pertained to the Plaintiff's excessive force claim against Martin for firing tear gas into Escobedo's apartment; the supervisory liability claim against the supervisors—Bender, Lucker, Zelt, and Hunter—for the tear gas fired into the apartment; the excessive force claim against the entry team—Selvia, Martin, Brown, and Straub—for the raid on the apartment and bedroom with tear gas and flash bang grenades; and supervisory liability claim against the supervisors—Bender, Lucker, Zelt, and Hunter—for the entry team's raid. On September 25, 2008, the Court issued an Opinion and Order [ECF No. 132] granting the Plaintiff's Motion for Certificate of Appealability and after hearing the appeal, the United States Court of Appeals for the Seventh Circuit (Seventh Circuit) issued a Mandate on May 20, 2010, affirming this Court's qualified immunity determination on summary judgment. From February 8–17, 2011, this case proceeded to an eight day jury trial. On February 14, prior to the Defendants presenting their case in chief, the Court granted in part their Motion for a Directed Verdict. The Court dismissed the entry team Defendants—Selvia, Martin, Brown, and Straub—as a matter of law. On February 17, the Jury returned a verdict in favor of

the remaining Defendants on all counts. The only issue remaining in this case that must be resolved before the entry of judgment is whether the supervisors—Bender, Lucker, Zelt, and Hunter—are entitled to qualified immunity for their decision to initiate the use of force.

The basic facts of this case have been thoroughly presented in this Court's May 5, 2008, Opinion and Order [ECF No. 111] and the Seventh Circuit's April 5, 2010, Opinion. *Estate of Escobedo v. Bender*, 600 F.3d 770 (7th Cir. 2010). Both of those opinions presented the facts at the summary judgment stage of this litigation and the Court now considers the evidence as it was presented at trial. Where the facts established at trial differ from those presented on summary judgment they are noted below in the Court's qualified immunity analysis. The basic sequence of events that forms the factual basis for this lawsuit did not change from summary judgment to trial: On July 19, 2005, Escobedo called 911 and told the dispatcher that he was armed, wanted to shoot himself, and that he was high on cocaine. The dispatcher spoke with Escobedo until Sergeant C.M. Taylor arrived at the scene and spoke with Escobedo. Then the Fort Wayne Police Department's Crisis Response Team (CRT) and Emergency Response Team (ERT) arrived on the scene and CRT negotiator Officer Bernard Ebentino took over speaking to Escobedo. For reasons explained below, the police decided to use a tactical solution after a period of negotiation. That tactical solution involved firing two rounds of tear gas into Escobedo's apartment and the ERT entering Escobedo's apartment with flash bangs. Escobedo did not survive the encounter.

## ANALYSIS

Judgment as a matter of law is granted when "a party has been fully heard on an issue

and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed. R. Civ. P. 50(a). "[T]he standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 149 (2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51 (1986)). In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

Governmental actors performing discretionary functions are entitled to qualified immunity and are shielded from liability, unless the plaintiff can show a violation of a constitutional right and, if successful in showing a constitutional violation, demonstrate that the right was clearly established at the time of the alleged violation. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). This analysis turns on whether a reasonable officer would have known that his actions were unconstitutional. *Id.* at 202. The purpose of the doctrine is "to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815 (2009). When confronted with a claim for qualified immunity, a court must address two questions: (1) whether the plaintiff's allegations make out a deprivation of a constitutional right; and (2) whether the right was clearly established. *Id.*;

*McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). The court may address these prongs in whichever order is best suited to the circumstances of the particular case. *Pearson*, 129 S. Ct. at 818; *McAllister*, 615 F.3d at 881. For a right to be clearly established, its "'contours . . . must be sufficiently clear that a reasonable official would understand that what he is doing violates the right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.'" *McAllister*, 615 F.3d at 884–85 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (citation omitted)). "As long as 'officers of reasonable competence could disagree on the issue, immunity should be recognized.'" *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (brackets omitted) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). In ascertaining whether a right is clearly established, this Court looks to controlling Supreme Court and Seventh Circuit precedent, *Baird v. Renbarger*, 576 F.3d 340, 345 (7th Cir. 2009), and the Plaintiff bears the burden of demonstrating the violation of a clearly established right, *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010). The Supreme Court directs:

> When summary judgment is sought on a qualified immunity defense, the court inquires whether the party opposing the motion has raised any triable issue barring summary adjudication. Once trial has been had, however, the availability of official immunity should be determined by the trial record, not the pleadings nor the summary judgment record. After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense.

*Ortiz*, 131 S. Ct. at 889 (internal citations and quotation marks omitted).

*Pearson* permits courts to address the qualified inquiry in whatever order best suits the case. The focus of the previous opinions in this case have been on the second prong—whether the constitutional right was clearly established. To some extent, the jury's verdict resolved the

first prong of the qualified inquiry by concluding that the Defendants did not violate Escobedo's constitutional right to be free from excessive force. *Teague v. Mayo*, 553 F.3d 1068, 1072–73 (7th Cir. 2009). However, the posture of this case requires that the Court consider the case as it existed before the jury returned its verdict. *See* Fed. R. Civ. P. 50(a)(2) ("A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury."). The Court did not rule as a matter of law in favor of Defendants Hunter, Zelt, Bender, and Lucker—the remaining Defendants in this case. Because the Court could not rule in the Defendants' favor on the issue of liability as a matter of law, which is a very similar issue to the first prong of the qualified immunity analysis, the Court must decide qualified immunity based on the second prong.

The burden still lies with the Plaintiff to show that Escobedo had clearly established rights that the Defendants violated. *Boyd v. Owen*, 481 F.3d 520, 526 (7th Cir. 2007). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right'" *Escobedo*, 600 F.3d at 779 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). The action in question does not need to have been previously held unlawful explicitly, "rather the unlawfulness must be apparent in light of the pre-existing law." *Id.* A clearly established right may be "established by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Id.* The Seventh Circuit noted that the conduct in this case "could possibly create a violation that is so patent that no violator has even attempted to obtain an appellate ruling on it," *id.* at 781, but that the "court

need not identify this as such a case, however, because on July 19, 2005, Defendants were properly on notice that the use of tear gas and flash bang devices in a closely analogous context was deemed unreasonable." *Id.* The facts at trial provided a different record than existed on summary judgment, and the Court now finds that the Defendants have qualified immunity based on the lack of clearly existing law and that no patently obvious violations occurred.

A. **Decision to Utilize Tactical Response**

The factors and circumstances leading up to the decision to deploy a tactical solution were more fully presented at trial than they had been on summary judgment. The Plaintiff's expert, Larry Danaher, provided testimony at trial that clarified the real liability issue in the case was whether to deploy a tactical solution in the first place. On cross-examination, Mr. Danaher testified:

> Q. Once the decision was made for the entry team to go in, you agree they acted in a way they were trained to do, what they were expected to do?
> A. That's correct.
> Q. You don't have any problem with what they did?
> A. No.
> Q. Once Deputy Chief Bender made the decision that a tactical response should be used, right?
> A. Correct.
> Q. Once he made that decision, it was proper and appropriate for Lieutenant Zelt to come up with a plan to execute that tactical response?
> A. That's correct.
> Q. And having a plan that relied upon the use of tear gas was appropriate?
> A. Yes.
> Q. Having a plan that required the entry team go in within the fashion they did was also appropriate?
> A. That's correct.

(Trial Tr., Day 4, 78:18–79:11.) On re-cross examination, Mr. Danaher provided further testimony that clarified the issue in the case:

Q. You say they should have continued the negotiations, right?
A. That is correct, sir.
Q. How long?
A. Again, as long as it takes. It's like --
Q. So six hours?
A. If that's what it takes, yes.
Q. Twelve hours?
A. Again, you don't put time over human life.
Q. Twenty-four hours?
A. That's what it would take.
Q. A week?
A. That's what it would take.
Q. A month?
A. Sir, again, if that's what it takes.
Q. So as far as you're concerned, there is no time limit? They could have closed off those streets and closed off those businesses, evacuated that building indefinitely as far as you're concerned?
A. What I'm saying is you don't put a time on someone's human life.
Q. That was a yes or no question, again, Mr. Danaher.
A. Yes.
Q. So from your perspective no time limit whatsoever?
A. As long they're talking.
Q. And the time to move from negotiations to some type of a response requires the exercise of judgment by the commanders on the scene?
A. That is correct.
Q. No two situations are alike?
A. That is correct.
Q. And because Rudy Escobedo was involved in this situation, no two situations could be alike?
A. That is correct.
Q. And even if they waited as long as you suggest, six hours, 12 hours, 24 hours, a week, however long, you still can't be sure that he wouldn't have died?
A. That is correct.

(Trial Tr., Day 4, 95:3–96:15.) The Plaintiff presented evidence that Escobedo was still talking to the police and did not become noticeably more violent during his discussion with the police. The Defendants presented evidence that over the three hours the CRT was in contact with Escobedo little to no progress was made in getting Escobedo to surrender. These arguments, along with Mr. Danaher's testimony excerpted above, help frame the issue now before the Court:

8

At the time of the incident was there a clearly established right under the Fourth Amendment to be free from the deployment of a police tactical solution when an individual is suicidal, on drugs, not making threats against anyone but himself, but also not progressing toward a peaceful resolution of the incident? There was not such a clearly established right on July 19, 2005.

The Court first reviews *Estate v. Smith v. Marasco*, 318 F.3d 497 (3rd Cir. 2003), discussed extensively in the Seventh Circuit's opinion. As in this case, "[t]he ultimate question [was] whether the decision to activate [the SWAT team] and [the SWAT team's] subsequent actions were objectively reasonable responses to this situation." *Id.* at 516. The *Marasco* Court focused its inquiry on "the severity of the threat to which officers were responding." *Id.* The Seventh Circuit relied on the *Marasco* Court's determination that a jury should hear the plaintiff's case because the officers were not attempting to make an arrest and there were no indications the plaintiff had a history of violence, even though he was believed to be armed. *Escobedo*, 600 F.3d at 782 (citing *Marasco*, 318 F.3d at 517). Nothing in the *Marasco* opinion establishes that an individual has a Fourth Amendment right to be free from the deployment of a tactical solution. In fact, the *Marasco* Court cited with approval the Tenth Circuit's admonishment in *Holland v. Harrington*, 268 F.3d 1179, 1190–95 (10th Cir. 2001), that SWAT teams should show more discipline in carrying out their duties than regular police officers, but the court did not question the deployment of the SWAT team in the first place. *Marasco*, 318 F.3d at 518.[2] Neither the Seventh Circuit's opinion, the *Marasco* case, nor any cases the parties

_____

[2] The *Holland* Court is instructive to this case because the court found that the plaintiffs failed to show that "by itself, the display of force inherent in the deployment of the SWAT team—the force invoked by the decision to deploy—was excessive under Fourth Amendment standards." *Holland*, 268 F.3d at 1191. The court instead focused on the SWAT team's actions once deployed. The SWAT team in that case was effectuating an arrest, which is factually distinguishable from this case, but the arrest was on a misdemeanor warrant of an individual with no criminal record, so *Holland* still provides guidance in this case. *Id.*

previously cited clearly establish an individual right to be free from the deployment of a tactical solution when an individual is suicidal, armed with a firearm, high on drugs, not making threats against anyone but himself, but also not progressing toward a peaceful resolution.[3]

**B.      Decision to Deploy Tear Gas**

The Seventh Circuit provided the following guidance about the clearly established law as of July 19, 2005, pertaining to the use of tear gas:

> [T]he use of tear gas is unreasonable when: (1) attempting to subdue individuals as opposed to mass crowds; (2) when the individual does not pose an actual threat; (3) when the individual is not holding hostages; (4) when the individual has not committed a crime and the officers are not in the process of attempting to make an arrest; (5) when the individual is armed but merely suicidal as opposed to homicidal; (6) when the individual is not attempting to evade arrest or flee from the police; and (7) when the individual is incapacitated in some form.

*Escobedo*, 600 F.3d at 783. The facts established at trial lead the Court to view factor two—when the individual does not pose an actual threat—differently than it did on summary judgment and ultimately reach a different conclusion on qualified immunity.

At the summary judgment stage, it was unclear whether Escobedo posed any threat. Instead, the police appeared to justify their decision to deploy tear gas based on "traffic concerns and the depleted energy of the officers on the scene; they were not based on any concern that Escobedo was an imminent threat to others." *Id.* The trial record shows that the police had a much greater concern that Escobedo was an imminent threat to others. Defendant Bender testified about multiple public safety factors that he considered as the events unfolded. As these

---

[3] The Court is not holding that police will always receive qualified immunity for the decision to deploy a SWAT team. Courts have found instances where the SWAT team deployment itself was not shielded by qualified immunity, although mainly in cases too recent to be considered in this case. *See, e.g.*, *Bellotte v. Edwards*, 629 F.3d 415, 419 (4th Cir. 2011).

excerpts from trial demonstrate, Defendant Bender was concerned about public safety, the

surrounding buildings, including a hospital and church with a daycare center, Escobedo's

elevated position, and a desire that any tactical solution take place after most of rush hour had

finished. Defendant Bender testified in part:

> Q. Why did you notify the hospital, then, of what was going on at Westberry Apartments?
> A. Well, it's -- the -- one of the things that I have to kind of take into account, as the incident scene commander, is to realize that there is a possibility that, you know, we have a person armed with a handgun. We did not know if he had any other types of weapons, whether if he had a rifle or a shotgun or other handguns. We had no idea what type of weaponry he possibly could have had. Again, I was advised that he was -- appeared to be high on cocaine or intoxicated. We had no idea how -- how much cocaine he had, any other intoxicants or anything like that in the apartment. I have to concern myself, number one, with the general public, then the police officers and then Mr. Escobedo.
> Q. Is that the order of priority from a safety standpoint?
> A. Yes, sir.
> Q. Is that consistent with the training you had received --
> A. Yes.
> Q. -- from all these schools?
> A. That would be correct.
> Q. Okay. Now, once you communicated with Captain Woods about setting up this outer perimeter and making contact with the hospital, did you talk with Lieutenant Zelt about what needed to be done with the S.W.A.T. team?
> A. Yes, I -- after talking with Captain Woods and requesting that he may contact with the hospital, as well as the Fort Wayne Newspaper Company, and Peerless Cleaners, who also has a plant adjacent to the building just immediately to the north, those were the main facilities. Also there's a church, Trinity Episcopal Church, on the southwest corner of Berry and Fulton, and they also had a daycare center. We wanted to make sure that was shut down as well. After he was told to do that, I then met with Lieutenant Zelt, and asked him, I said, you know, I said, "I'm sure you know, but just, you know, in case this guy would happen to go into an active shooting mode, what do you recommend or maybe we need to start thinking about, you know, possible response if that would happen."

(Trial Tr., Day 6, 27:16–29:4.)

> Q. All right. Now, had you ever had a situation, though, where the subject, the barricaded suicidal subject was on the seventh floor of a building, either in an apartment or some office building?

A. Uh, I had never -- all the different call outs that I had been to, I had never, at that point in time, had never had anyone probably higher than the second or third floor of any building involved in any type of incident. So this was -- this incident where he was on the seventh floor was new to me.

Q. Did that create some logistic problems, from your standpoint?

A. Uh, yes.

Q. What were those?

A. Well, the two that come to mind is that he's on the high ground. He has overwhelming command of where he can see and where he could possibly discharge a weapon into. And we are very limited as to what we can do as far as taking any action against him, you know, from a distance. And that would be possibly as a countersniper location or whatever. There was very few places that we could go where we could counteract any type of attack that this gentleman might possibly attempt to do.

Q. Okay. Based upon your training and experience and these situations, are suicidal -- barricaded suicidal subjects who are high on intoxicants like cocaine, are they predictable in their behavior, in your experience?

A. They're very unpredictable.

(Trial Tr., Day 6, 29:24–30:25.)

Q. And what was your goal or what did you have in mind when you talked about thirty minutes more for negotiations?

A. Well, based on my experience in traffic, the several decisions or areas that made -- helped me make my decision is the fact that around 8:30 in the morning, most of the traffic in the downtown area is pretty much -- the rush hour is pretty much over at that point. And then it kind of settles down for the next couple of hours to more steady traffic flow. I wanted to make sure that we had most of the traffic out of the downtown area before any attempt to get inside the building was attempted. Also, most people would already be at work and they would be a lot safer inside the buildings than they would be trying to come in and out of the buildings in that area where they would be out in the street or the parking lots. We had all those areas shut down as much as possible, but we still had pedestrians that would filter through gaps in our perimeter we had, and we would grab those people and get them out of there. That was one of the concerns. The other concern that we had was, again, not knowing what type of weapons for sure that he had. There was a fear that if he would go into an active shooting position, that we would be putting civilians at risk. It also takes a little bit of time for Lieutenant Zelt to have his officers prepare for a gas attack, as well as to get their equipment and stuff they need to breach the door, and go in.

(Trial Tr., Day 6, 38:19–39:20.) These public safety considerations make this case

distinguishable from the *Marasco* case the Seventh Circuit relied on in determining the second

factor in its analysis whether "the individual does not pose an actual threat." In *Marasco*, the court relied on the fact that "[t]here was no indication that [the plaintiff] had been using a gun recently or that Smith ever has used a gun in a violent manner." *Marasco*, 318 F.3d at 517. Likewise, there was no indication in this case that Escobedo had used a gun recently or ever used one in a violent manner. However, *Marasco* involved a plaintiff who was inside his home in a residential area, which is distinguishable from Escobedo's presence on the seventh floor with a clear tactical advantage and within shooting distance of a hospital, church with a daycare center, businesses, and rush hour traffic. The safety concerns the police had about Escobedo's tactical advantage and proximity to surrounding buildings are enough to establish that Escobedo posed an actual threat. Thus, the police did not violate the second factor in the Seventh Circuit's calculus, because Escobedo's clearly established right to be free from the use of tear gas requires that he not be posing an actual threat, which is not supported by the evidence presented at trial. Even though the six other factors the Seventh Circuit considered are still present, its calculus is conjunctive and the fact that Escobedo posed an actual threat means that at the time of the incident he did not have a clearly established right to be free from the deployment of tear gas.

This Court and the Seventh Circuit also relied on the levels of tear gas deployed in ruling against the Defendants' qualified immunity argument on summary judgment. In concurrence, Judge Manion noted that "reasonable officials would have known that using twelve times the incapacitating quantity of tear gas to extricate a person at home alone who had only threatened to harm himself and was not suspected of committing a crime 'was unconstitutional without guidance from courts.'" *Escobedo*, 600 F.3d at 787 (Manion, J. concurring in the judgment in part and dissenting in part) (citing *Gossmeyer v. McDonald*, 128 F.3d 481, 496 (7th Cir.1997)).

The majority declined to rule whether the use of tear gas was a patently obvious constitutional violation, but it considered the "twelve times the incapacitating amount of tear gas" in arriving at its conclusion about clearly established law. *Id*. at 783. This Court also relied on the twelve times incapacitating amount in ruling against the Defendants on summary judgment, noting "The Defendants—including Zelt, who calculated the amount of gas—did not explain why a level of gas twelve times beyond incapacitation level was needed, and the Defendants' expert did not address the claim that the amount of gas was more than necessary." (Op. & Order 52, ECF No. 111.) The record at trial provided more evidence on what twelve times incapacitating gas means, leading the Court to conclude that this amount should not impact the qualified immunity calculus as it did on summary judgment.

Defendant Zelt—who mixed the tear gas—and both the Plaintiff's expert's and Defendants' expert's testimony revealed that an incapacitating level of tear gas is a misleading unit of tear gas. Defendant Zelt testified:

> Q. And you've used that incapacitating effect. And just so the jurors understand, everybody understands, what do you mean when you say an "incapacitating effect"?
> A. Yes, incapacitating, when you're referring to barricade operations, is slightly different than when you're talking about hand-held spray or something like that. The definition of incapacitating concentration in barricade operations is that level at which the suspect feels they can no longer stay inside and must leave the structure. It does not mean unconsciousness or anything of that nature.
> Q. So they get so uncomfortable from the gas that they have to leave?
> A. Yes, that's correct.

(Trial Tr., Day 6, 155:3–15.)

> Q. Okay. And in this particular case, did you determine what type of gas to use?
> A. Yes. We only use two types in the Fort Wayne Police Department: CS gas and OC gas. And I generally, in most cases, prefer to use a combination of both.
> Q. Why?
> A. Both affect the body differently. Um, CS, also known as tear gas, has been

around since the 1920s. And it is primarily an irritant. It's a powdered micro pulverized powder. And it irritates the skin glands, the sweat glands, irritates the eyes. If you breathe it in, it irritates the lining of the lungs and causes coughing and things of this nature. So it affects the body one way. OC, also known as pepper gas, is oil of red pepper. It's an inflammatory. It inflames the skin and things. If anybody has eaten very, very hot peppers, and you get a little on your skin, you know it turns red. Well, that's the inflaming effect. And the primary effect of OC is going to be just a burning inflaming feeling. If you breathe it in your nasal passages will have a burning sensation. Your eyes will get a burning sensation, et cetera. Some people may have resistance to OC, but not CS. Some people may have resistance to CS but not OC. When you combine the two together, it seems to be much more effective in barricade operations.

Q. And is that something consistent with the training you had received in the various schools and your experience as well?

A. Yes, in fact, most munitions we use combine them already from the factory.

Q. And is this the type of product, this OC/CS that you described is it the type of product you have you had used regularly in the past in similar situations?

A. Yes, about fifty or sixty times or so.

Q. And were you familiar with the use of such products by other law enforcement agencies in Indiana and across the country?

A. Yes, it's very commonly used.

Q. So nothing unique about your department, your team using that type of product?

A. No, nothing unusual at all.

Q. Now, are the effects from this -- the gas that you described, the OC and the CS, are they expected to be permanent or short lasting; typically how long do they affect someone?

A. Of course, each individual will react differently. If an individual is incapacitated, I would expect the effects of barricade munitions -- once one is exposed to fresh air, they generally dissipate pretty quickly within a few minutes.

Q. And with regard to -- I think you made the comment that it affects each person differently or it can --

A. Yes.

Q. -- affect each person differently. Based upon your experience and training and so forth, can that depend upon whether or not the person is under the influence of drugs like cocaine?

A. Absolutely. The more drugs and alcohol one consumes, the more pain tolerance they will have to something of that nature.

Q. Meaning what?

A. They -- they can tolerate much more of it than someone who is typically not under the influence of drugs or alcohol.

Q. So the fact that Mr. Escobedo was on cocaine, admittedly at the time, and perhaps a high dose of cocaine as you described, would that have potentially some bearing on his ability to withstand certain amount of gas?

A. I believe so, yes.

Q. Did you take that into account in determining how much gas to utilize in this case?

A. Absolutely.

Q. I mean, is this an exact science or is it something that you have to use some discretion and judgment in determining how much to use?

A. It is not an exact science. As plaintiff's expert, Mr. Danaher, mentioned, there used to be a lot of emphasis on trying to calculate incapacitating concentration/50 and lethal concentration/50 but that is not done anymore. It's pretty much abandoned by the community.

Q. Why? Why is that?

A. It proved to be an ineffective system, because it did not take into account things such as drug use, different target locations, having interior doors, things of that nature. It didn't take into account suspect motivations. It didn't take into account that the suspect might fight the affects by, you know, seeking water or trying to put blankets or towels over their faces, things that suspects commonly do in these operations. It also didn't take into effect the fact that the tests done were conducted by the Army in 1969 at the Edgewood Arsenal, and they used burning pyrotechnic tear gas.

Q. What's that?

A. When people think of S.W.A.T. teams introducing chemical agents and you see TV and movies, traditionally what you'll see is some soup-can type device that's thrown in it and it starts burning and emitting smoke and flame. That looks good on TV, but it's not the kind we use for barricaded suspect operations. Those grenades do exist. They're generally used for crowd control outdoors. They're meant to produce a big smoke cloud filled like a football size area. And by burning, of course, you can see where the smoke is going. In barricade operations, we do not want to use burning gas, because it can set the target on fire. If we produce smoke, the suspect isn't going to be able to see to get out. And if we go in, we're not going to be able to see. And burning smoke munitions deplete oxygen supply, and can actually suffocate someone. So we don't want to use munitions for barricades. Unfortunately the tests were done using burning, barricade munitions which is the most effective delivery system there is. We use powder-filled grenades, liquid filled grenades and aerosols, which are far less effective in their delivery. So the system had so many weaknesses, it did not take into account things that typically happen in the tactical world. And as a result, it was found to be an ineffective system. The recommendation now, and what teams do now, is you simply base the amount used on your training, your experience, and the totality of the circumstances.

(Trial Tr., Day 6, 157:2–161:18.)

Q. Okay. Now, there's been some discussion at some point in time about the amount of the tear gas munitions that were put into the apartment of Mr.

Escobedo as being 12 times incapacitating amounts or levels or something. Can you explain to the jurors what that means?

A. As I said before, that is based on an outdated system that's no longer used. Based on those Edgewood Army Arsenal tests. And the correct technical term is IC/50, incapacitating concentration/50, which means 50 percent of the population. And without getting all the details of how the testing was conducted, basically the Army concluded that under ideal circumstances, the average person would possibly exit a structure when this amount, which they determined was 416 milligrams pure cubic meter was delivered. Keep in mind what that says is at this level, you have a 50/50 chance, okay? Fifty percent of the test subjects will leave, fifty percent will not. Incapacitating means that level which you leave the target, okay? Knowing that that is my starting point, okay, you have to determine what you want the assault to do. In this particular case, I wanted to incapacitat[e] him quickly so that he wouldn't commit suicide. Obviously, if I want better than 50/50 chance, and I take into account drug use, all these other factors that I discussed, I need to use more than incapacitating concentration.

Q. And you only used half the munitions initially in the first volley, right?

A. Yes, I packed the munitions so I knew exactly how many they had access to.

Q. And was the goal with regard to the use of tear gas to get him to come out, surrender without the gun?

A. Yes, it was.

Q. And so when you decided to do the second volley, again, was that the purpose to try and get him to surrender and come out without the gun?

A. Yes, it was.

(Trial Tr., Day 6, 167:21–169:7.)

Q. Was there ever a point in time that Mr. Escobedo voluntarily left the apartment once the tear gas was introduced?

A. No, he did not.

Q. So given the definition of incapacitated, then, what that means, was there ever a point in time that Mr. Escobedo actually became incapacitated because of the amount of gas that you put in there?

A. No, he did not.

Q. And with regard to those Army studies, you said that apparently 50 percent of the people in the test subjects would leave, right?

A. That's correct.

Q. Okay. But would they have the same motivations as someone like Mr. Escobedo necessarily?

A. No. That's, of course, one of the problems with the testing. They were told to leave the test area whenever they felt that they couldn't take it. They were paid the same amount of money whether they stayed in for one second or one hour.

Q. Okay. And even when levels were increased in the testing, even though that may not be appropriate to use now, as you said, even when the levels of tear gas

introduced were escalated, did some people still stay anyway?

A. One test subject never left the area and was eventually asked to leave, because they felt that it was getting close to lethal concentration.

Q. So based upon your training and experience, then, up until that point in time in 2005, did you believe that the amount of tear gas that you had introduced to Mr. Escobedo's apartment was a level that was going to cause him any serious harm?

A. Absolutely not.

(Trial Tr., Day 6, 169:15–170:21.) On redirect examination, Defendant Zelt testified:

Q. With regard to the introduction of the gas into the apartment that you described, Lieutenant Zelt, once the first round of munitions were fired in and broke through the windows, would that cause there basically to seal or whatever vacuum in the apartment, if there was anything to be broken?

A. Yes, it would have introduced air into the target then.

Q. And so what happens with the gas; if there are open windows or broken windows like that, does all the gas necessarily stay in the apartment or does some of it spill out or leak out through the windows typically?

A. No, that's -- a considerable amount would go back out the windows. And that, there again, is one of the problems with the incapacitating/50 and lethal/50 system, in the fact it was an airtight environment. It did not take that into account.

Q. All right. So did you take that into account when determining how much to put in this particular apartment that you were aware the windows were going to be broken by the way it was being delivered, was that something you considered?

A. Absolutely.

Q. In determining what amount was appropriate?

A. That's correct.

(Trial Tr., Day 6, 218:12–219:7.) Both experts in the case provided testimony consistent with

Defendant Zelt in clarifying what is meant by an incapacitating level of gas. The Plaintiff's

expert, Mr. Danaher, testified:

Q. You agree that when negotiations aren't making progress, and it's just a situation like this, the next step is use to use tear gas?

A. Are you saying from -- if I understand you correctly, you're saying progress wasn't being made and, in my opinion, progress was being made.

Q. I want you to assume for purposes of my question, that progress was not being made in these negotiations. Wouldn't you agree that based upon the training that are provided to police officers and that you provide, that the next step to use would be to use tear gas?

A. Yes.

Q. Okay. And tear gas is used by police officers and police departments in

situations like this all across the country all the time, right?

A. It -- are you talking about the facts that are in hand here or just --

Q. No, generally involving barricaded situations with suspects where negotiations aren't progressing?

. . .

It's true, is it not, that in situations where negotiations break down and there's not progress being made, that police officers are trained in these situations that the next step to do is to use tear gas?

A. Yes.

Q. And so if you were to assume in this case that there was no progress being made after more than four hours of negotiations with Mr. Escobedo, in the judgment of the officers at the scene, it is the judgment they had to make as the commanders, that tear gas would be the next step to take?

A. Yes.

Q. And it would be appropriate to fire that tear gas on the seventh floor apartment from the street and enter it into the apartment through the windows?

A. Yes.

Q. And there's no specific standards, are there, that indicate exactly how much tear gas should be used under any given circumstance like this?

A. There used to be standards, um, that we kind of hold to them. Again, that is we don't want to use excessive gas.

Q. But there's no specific or specific rule about that, is there?

A. No.

Q. It depends on the situation and it's highly variable, right?

A. That is correct.

Q. The purpose of the tear gas is to encourage the person to come out of the area they're barricaded in, right?

A. Yes.

Q. So you won't have to go in, right?

A. You would hope, yes.

Q. And hopefully, then there won't need to be anymore force used by anyone, right?

A. That's correct.

Q. So in this case you agree that was the purpose of why the tear gas was introduced into the apartment?

A. Yes.

Q. And for that purpose, it was appropriate to do so?

A. Yes.

Q. In your experience and based upon the training you provide others, it's your hope in such circumstances that that's going to end the situation peacefully and allow the person to be taken into custody without any other force being used?

A. Would you repeat that question, again.

Q. It was long. I'll try and shorten it up. Based upon your experience and the training that you provide others, using tear gas in a situation, the purpose of it is

to get the person out of the apartment so they can be taken into custody without the need for other force?

A. It's two fold purposes. One is to give you the tactical advantage, if you have to go in there. And then secondly, hopefully the person would be incapacitated where you can get that individual out.

Q. And incapacitated, the word is used a lot. Incapacitated, you're not talking about causing the person to be unconscious, are you?

A. No, I'm not.

Q. Incapacitated in this situation means making them so uncomfortable they won't continue to stay in there?

A. Correct.

Q. So it's causing them to come out. So whenever you use "incapacitating amount" or "level", you're talking about the amount of tear gas that's going to cause a person to come out?

A. Correct.

Q. And you said before that that's highly variable. Some people can withstand more than others?

A. Yes, they can.

Q. And if they're under the influence of drugs or have mental issues, that could cause high variability in how much they might be able to withstand?

A. Yes.

Q. So the fact that there was 12 times incapacitating amounts of tear gas put in there doesn't tell you anything about whether or not the person was going to be rendered unconscious or harmed, right?

A. Explain that a little bit more.

Q. Okay. Well, 12 times incapacitating doesn't mean 12 times the amount that would cause someone to be unconscious?

A. That's correct.

Q. It's just 12 times a standard that the police officers don't even use anymore, right?

A. It's 12 times higher than what you would normally use, yes.

Q. But if you put in some gas and it doesn't cause the person to come out, it's certainly appropriate and consistent with the training police officers receive to use more gas?

A. Again, that depends and I can't answer that yes or no unless you let me --

Q. Well, let me just -- it could be, is that fair?

A. That's fair.

Q. And it would depend on the circumstances?

A. That's correct.

Q. And the officers would have to make a judgment about that on the scene knowing what they know at the time?

A. Correct.

(Trial Tr., Day 4, 44:15–51:20.) The Defendant's expert, Ronald McCarthy, testified about the

use of gas as well:

Q. Okay. With regard to the amount of tear gas to use in any given situation, when training commanders like S.W.A.T. commander Lieutenant Zelt and other commanders across the country, is there any magic formula or numbers you teach officers to rely upon or use when determining how much gas is needed?

A. There isn't a specific number. You just -- you want to use a reasonable amount.

Q. Does it depend upon the circumstances and the situation that the officer faces?

A. Yes, it does.

Q. And with regard to the effects on the person who is being -- the subject of the gas, based upon your experience in dealing with subjects over many years, and the training and so forth that you've talked about, can it -- can the effects on one person, as opposed to another, be quite variable?

A. Yes, it can.

Q. And do, again, based upon your training and experience, whether the person is under the influence of drugs, can that have an effect on how the gas will affect or impact them?

A. Yes, it can. I've never seen anybody who wasn't under the influence or emotionally disturbed not immediately react to gas. If they're not under the influence or emotionally disturbed, they are immediately affected, and they immediately react, especially CS gas. OC works approximately as fast, not quite as fast. In any event, emotionally-disturbed people or people who are under the influence or both oftentimes any less lethal option that we utilize, including gas, doesn't have the effect we want it to have. That will happen.

Q. All right. Is there any way to predict the effect on any given individual before you introduce the gas?

A. No, sir. There's times when somebody is really under the influence heavily of a variety of different chemical agents, cocaine or methamphetamine, and they come out, and they respond. So it's not possible to predict.

Q. Okay. In this particular case, was it your understanding that when Lieutenant Zelt introduced the gas into Mr. Escobedo's apartment, that he asked his tactical officers to fire some rounds in and then wait for a period of time?

A. Yes, sir.

Q. And based upon your experience and the training you provide to officers, was that an appropriate tactic to employ in this situation?

A. Yes, sir.

Q. Why is that?

A. Uh, you want to allow the gas to work, and it takes longer with some people than it does with others if they're under the influence, or if they happen to immediately -- if you get into a confined space and shove clothes under the crack at the bottom of the closet door, if it's a closet or the bathroom, and they can barricade themselves against the influence of the gas and it takes some time for the gas to get to them. Sometimes, they can actually seal themselves away from it.

So you wait. And then if you don't get the desired result, then you would repeat
gas again.
Q. Is it your understanding that's what Lieutenant Zelt did in this case as well?
A. Yes, sir.

(Trial Tr., Day 7, 39:6–41:13.) On redirect examination, Mr. McCarthy explained in greater

detail where the incapacitating terminology comes from, along the same lines as Defendant

Zelt's earlier testimony.[4]

Q. Okay. There's been some testimony about the amount of gas that was used and
the talk about incapacitating amount, incapacitating use and something like that.
Are you familiar generally with those terms?
A. Very, yes.
Q. And can you explain to the jury what those terms mean, and what significance,
if any, they have in connection with your review of this case?
A. There's incapacitating concentration of gas or an acronym ICT or LCT, lethal
concentration of gas. And this was a project put together by a Ph.D. for the
International Association of Chief of Police in 1967. And it was based, as best
this gentleman could do it -- and he did a very good job -- on theory and there was
really no data for him to collect, so he did the best job he could. What they later
found -- and they've totally discredited the study -- was nobody has ever died of
an over concentration of OC or CS gas. It has never happened. And as an
example, I've used as much as 168 chemical agents, items of various insundry
types in one incident and nobody died from an over use of the gas. So therefore, it
can't -- so far, nobody has ever died from it. And it's been used ten's of thousands
of times over the years. So the LCT or ICT incapacitating level, lethal  level was a
mathematical formula calculation that was done away with several years ago. ICP
disclaimed it and that was the organization that offered it originally; they
disclaimed it in 1988. 1988 or 1989, and said don't use it, it's not accurate. And
companies that manufactured chemical agents stepped away from it.
Q. So if there was testimony in this case about 12 times an incapacitating amount
of gas being used, does that have any significance to you about whether there was
too much gas or not enough gas used in a situation like this?
A. No, sir.

(Trial Tr., Day 7, 96:10–97:19.) All of the testimony just excerpted clarifies what was unclear at

summary judgment, whether the fact that the amount of gas used was "twelve times

---

[4] Due to a separation order Mr. McCarthy was not present during Defendant Zelt's testimony.

incapacitating" should weigh against the Defendants' claimed qualified immunity. In light of the evidence at trial, it should not.

**C.      Decision to Deploy Flash Bangs**

The Seventh Circuit provided the following guidance about the clearly established law as of July 19, 2005, pertaining to the use of flash bang grenades:

> Based on the pre-existing case law, it was clearly established as of July 19, 2005, that throwing a flash bang device blindly into an apartment where there are accelerants, without a fire extinguisher, and where the individual attempting to be seized is not an unusually dangerous individual, is not the subject of an arrest, and has not threatened to harm anyone but himself, is an unreasonable use of force.

*Escobedo*, 600 F.3d at 786. Evidence presented at trial not before the courts on summary judgment was that Escobedo was an unusually dangerous individual. The testimony regarding public safety concerns that is excerpted above alters the analysis with regard to whether Escobedo was dangerous. Defendant Zelt testified about Escobedo's hallucination, further evidencing the Defendants' concerns about Escobedo's erratic and dangerous behavior:

> Q. Were there any comments made by Lieutenant Hunter or Officer Torres that cause you to conclude or raise any concerns about whether or not Mr. Escobedo was hallucinating or having delusional behavior?
> A. Yes, I did.
> Q. Tell the jurors what you learned in that regard.
> A. I learned frequently, and I was aware of this prior to my arrival as well, listening to radio traffic, that it appeared Mr. Escobedo was suffering hallucinations, was delusional, that prior to the police even arriving, he believed that police officers were in the apartment with him. And frequently, during the incident, it was reported to me that he was reporting that he was hearing and seeing police officers looking at him through the seventh floor windows primarily from the bathroom seemed to be a big fixation. He was convinced or at least said he was convinced that police officers were looking at him from the seventh floor bathroom window.
> Q. Did that raise particular concerns for you in your capacity as the S.W.A.T. team commander?

A. Yes, it did.

Q. What were those?

A. People who are under the influence of drugs, um, especially cocaine to the extent where they're having hallucinations and what not, they are very, very unpredictable. And it has been my experience after dealing with thousands of these individuals, that they can become explosively violent without any warning whatsoever. If he is believing in his mind that he currently sees police officers looking at him through bathroom windows, it is conceivable that he could try to take action against those imaginary police officers in the window. And if he were to do that, uh, by firing his weapon at that window, or what he perceived to be or what he perceived were police officers, those rounds that he could fire could come to rest anywhere within the downtown area west of there, including St. Joe Hospital, neighborhoods beyond it, and there would be very little that we could do to prevent that.

(Trial Tr., Day 6, 135:21–137:8.) In addition, evidence at trial showed that the manner in which Escobedo barricaded himself into his apartment made him unusually dangerous to the police. Although Escobedo never told police negotiators he intended to harm anyone but himself, there were times prior to the deployment of a tactical solution that the police viewed Escobedo as potentially being an unusually dangerous individual. An 8:18 AM notation on the Fort Wayne Police Department Hostage Negotiation Team Time Line Log, admitted as Plaintiff's Exhibit 3, reads, "says has knife now." (Pla.'s Ex. 3, at 5.) Defendant Hunter, the head of the CRT, testified at trial:

Q. What's the entry at 8:18 say?

A. Still talking of shooting himself, says he -- says has knife now.

Q. Good sign or bad sign?

A. Bad sign.

Q. What's particularly bad about that?

A. He still says that he's committed to doing this.

Q. Is there any concern raised by the knife?

A. Uh, that ups the ante; it's another weapon.

Q. In your experience and training over the years in CRT and as a police officer, do people that want to kill themselves usually have multiple weapons that they describe they intend to use?

A. No, sir, they do not.

(Trial Tr., Day 5, 114:14–115:2.) At 8:28 AM on the Time Line Log, there is a note "says he is

coming out but gun is still in hands." (Pl.'s Ex. 3 at 6.) Defendant Hunter, testified at trial:

> Q. 8:28.
> A. Says he's coming out, but gun still in hands.
> Q. Good sign or bad sign?
> A. Bad sign.
> Q. And is there anything particular about that that raises any concern on your part?
> A. Well, if he's coming out with a gun in his hands, that poses a threat to himself and to the entry team or the takedown team.

(Trial Tr., Day 5. 115:7–15.) Mr. Danaher also testified about the 8:28 incident:

> Q. That would not have been a rational thing to do, right?
> A. Well, he is now beginning to --
> Q. That's a yes or no question.
> A. No, it's not a rational thing.
> Q. It would have been a very dangerous thing to do, right?
> A. Yes.
> Q. It would have increased the likelihood he would have been shot, right?
> A. Yes.
> Q. It would have increased the likelihood one of the officers would have been shot?
> A. Yes.
> Q. It would have been increased the likelihood that somebody that was in the hallway or an adjacent apartment might have been shot?
> A. That is correct.

(Trial Tr., Day 4, 73:3–18.) These incidents in addition to the police concerns discussed above

about Escobedo's erratic drug-induced behavior,[5] tactical high ground, and sensitive surrounding

buildings, provide a clearer picture of the potential threat Escobedo posed even though he did not

---

[5] As excerpted above, Defendant Bender testified:

We had no idea what type of weaponry he possibly could have had. Again, I was advised that he was -- appeared to be high on cocaine or intoxicated. We had no idea how -- how much cocaine he had, any other intoxicants or anything like that in the apartment.

(Trial Tr., Day 6, 27:23–28:3.).

make any explicit verbal threats against others. Even though Escobedo did not issue any explicit verbal threats to the public or the police, the Court finds that Escobedo was unusually dangerous and thus did not have a clearly established constitutional right to be free from the use of flash bangs.

The evidence at trial also provided a clearer record on the placement of the flash bangs, which further alters the qualified immunity calculus. Given the way Escobedo had barricaded himself, the police had to pass through a "fatal funnel" to get to Escobedo. To ensure officer safety, they deployed a flash bang that allowed them to pass through the barricade and enter the bedroom. The Plaintiff's expert, Mr. Danaher, testified about the entry team's use of flash bangs:

> Q. Let's talk about the flash bangs now. They're also known as distraction devices, is that right?
> A. That is correct.
> Q. You would call them distraction devices, is that right?
> A. That's correct.
> Q. You mentioned before they're like a grenade. They're really not like a grenade, are they?
> A. They are explosive. They are guided by ATF, which is Alcohol, Tobacco and Firearms. They are explosive. Any time we use them, we're supposed to report those to ATF, because of the explosion factor that occurs.
> Q. But a grenade explodes metal and it goes flying everywhere and its purpose is to kill people, is that right?
> A. That's correct.
> Q. The purpose of this flash bang wasn't to kill or even hurt anyone, right, that's not their purpose?
> A. That's correct.
> Q. And the use of these type of flash bangs, again, are used by police officers and police departments every day all across the United States?
> A. They're used quite often, yes.
> Q. It's a generally-accepted technique that you expect police officers and police departments to use all the time?
> A. Yes.
> Q. And their purpose is to protect the police officers when they're in dangerous situations?
> A. That is correct.
> Q. A dangerous situation with someone who is armed with a gun who's high on

cocaine and delusional would be one of those situations, right?

A. That is correct.

Q. It's also designed to try and protect the person inside from being harmed, right?

A. Yes.

Q. And explain to the jury why setting off a flash bang in a room with someone who is armed might protect them as well?

A. What it is, it's trying to, again, shake up the computer where that individual doesn't know how to respond. You're looking for a startled reaction where hopefully they can't use deadly force again you. You go in there quickly, because you're trained to be able to deal with that distraction device in there.

Q. And since they might be confused momentarily, maybe have disruption of their vision and hearing, and the officers are able to get in there during that time frame, they may be able to take the person into custody and not shoot them or use any other force?

A. That's correct.

Q. And so that's one of the purposes of the flash bang, right?

A. That is correct.

Q. Now, I know you disagree with the decision that was made by the commanders on the scene about going in and stopping the negotiations. You've made that clear. But once the decision was made to use the tear gas, and once the tear gas was used and Mr. Escobedo didn't come out of the apartment voluntarily, and the decision was made that the entry team go in, it was perfectly appropriate for them to use flash bangs in those circumstances, was it not?

A. Again, I'd have to explain.

Q. It's a yes or no.

A. Yes.

Q. Right. And that's because when those officers were going into that apartment, they knew that Mr. Escobedo was armed with a weapon?

A. That is correct.

Q. In fact, the officers had reported, when they first arrived, that they heard him chamber a round in that weapon?

A. I don't remember hearing that.

Q. I'll ask you to assume that's the testimony.

A. Yes.

Q. All right. So under that circumstance, it would have been dangerous, highly dangerous for them to go into that apartment without using a flash bang?

A. That's correct.

Q. In fact, that would have been contrary to the training that police officers receive?

A. That is correct.

Q. Contrary to the training that you provide to police departments every day?

A. That's correct.

Q. So when they got to the front door and banged the front door open, tossed in

the clear-out canisters at that point, there was nothing improper about that, was there?

A. No.

Q. And when Mr. Escobedo didn't come out at that point, even though they were yelling for him to put the gun down and surrender, there was nothing improper about them putting the flash bang in the living room at that point?

(Trial Tr., Day 4, 49:21–53:9.) After the Court overruled an objection, Mr. Danaher's testimony

continued:

Q. Mr. Danaher, going back to the circumstances, again, once the decision was made to enter the apartment, the tactical team was appropriate for them to throw the clear-out canisters inside the living room, right?

A. That's correct.

Q. And to call out for Mr. Escobedo to put the gun down and to surrender?

A. That's correct.

Q. To throw in the flash bang, as they did, to protect themselves once they made the decision to go in, right, into the living room?

A. Into the living room, yes.

Q. Yes. And also for the protection of Mr. Escobedo, if he was there, in hopes they could take him into custody before there was a need to shoot any guns, right?

A. That's correct.

Q. It was proper for them to clear that area to look for him and see if he was there?

A. That's correct.

Q. Now, with regard to the small fire that occurred when the flash bang was thrown in there, you've testified about that?

A. Yes.

Q. Right? That's a very unusual occurrence, in your experience, from using flash bangs, right?

A. It does happen. That's why we carry fire extinguishers with us.

Q. But that doesn't usually happen?

A. No.

Q. No one was is suggesting here the police officers were trying to set the apartment on fire, is there?

A. No.

Q. Okay. So once they were inside the apartment and cleared that space, it was appropriate for them to yell out to Mr. Escobedo while he was in the bedroom to put the gun down and surrender and come out, right?

A. That's correct.

Q. That would be consistent with the training police officers receive and the techniques they're trained to use and do?

A. That's correct.

Q. Okay. And then when they tried to get through the door, you heard or you read, I assume, that the door was heavily barricaded?

A. There was some type of barricade, yes.

Q. Okay. I'm going to show you some photographs, Mr. Danaher, that are already in evidence. This is Defendant's Exhibit PP. Have you seen photographs of the inside of Mr. Escobedo's apartment as part of your review of this case?

A. Yes.

Q. And so does this look like the photograph from the living room area looking toward the bedroom door?

A. It appears to be, yes.

Q. You see where the bedroom door appears to have been broken in half as a result of the entry?

A. Yes.

Q. This is Exhibit QQ, also appear to be a photograph you saw showing the broken door from the bedroom looking at that door and back out into the living room showing some of the items that had been used to barricade that door?

A. Yes.

Q. Defendant's Exhibit RR, looking into the bedroom from the living room showing the bed frame that had been put up against that door to barricade that, you saw that as well?

A. Yes.

Q. Exhibit SS, looking in the bedroom again of Mr. Escobedo's apartment, showing a large television, dresser drawers, bed frames, all those items that were used to barricade Mr. Escobedo's door, you saw that as well?

A. Yes.

Q. Would it be fair to describe his bedroom door as having been heavily barricaded?

A. It was heavily barricaded, yes.

Q. It would be difficult for an entry team to get through that barricade, isn't that fair?

A. It would create some obstacles for them, yes.

Q. You've heard the term "fatal funnel", haven't you?

A. Yes, I have.

Q. You use that term in both in training officers, do you not?

A. Yes.

Q. What's that term mean?

A. To make it more sense, fatal funnel is think about it as if you just concentrate on one little area, like looking through a key hole. That's fatal, because you need to look beyond that -- that little hole that you're looking through.

Q. Isn't that also a term that is used by police officers to describe an entry way that an entry team is coming through?

A. Yes.

Q. And that's because that's the place that if someone wants to shoot you, that's where they're going to be expecting you to come through?

A. That's correct.

Q. So if someone intends to do police officers entering through an apartment, through a door of an apartment or a bedroom door, and they intend to shoot the officers, that's the most likely place they're going to do it?

A. Yes.

Q. And that's what you teach and train officers to be aware of?

A. That's correct.

Q. And one of the reasons you use these flash bangs to disorient someone inside who has a gun is to give officers a chance to get inside and avoid being shot at this fatal funnel position?

A. That's correct.

Q. In this case you read testimony that it took considerable time for the officers to get through the bedroom door because of it being heavily barricaded, right?

A. I don't know about the term of time, but it did create an obstacle for them, yes.

Q. A difficulty, correct?

A. Yes.

Q. And it was appropriate under these circumstances when they made the decision to enter the bedroom, to put a flash bang in that room for their protection and for Mr. Escobedo's protection?

A. It's appropriate if you put it in the right place into that room where you're not going to put it in a place to harm somebody.

Q. So the answer to my question was yes, it was appropriate for them to use a flash bang device before they entered that bedroom?

A. Yes.

Q. And as far as placing that, that requires the person doing it to exercise some judgment?

A. That is correct.

Q. And before they did that, they didn't know where Rudy Escobedo was in that bedroom?

A. That's correct.

Q. There no indication they had any reason to know he was in the closet?

A. That's correct.

Q. And in order to get that flash bang in the room, the officer would have had to deploy it over the barricade that was there, right?

A. Well, you could also deploy it just right outside that door, too, when you're --

Q. Outside where?

A. Outside that bedroom door as you're starting to break in. But yes, you try to be careful where you place that.

Q. Well, if you put it on the other side of the barricade, then the effects of it wouldn't have been nearly as significant as putting it on the other side of the barricade?

A. That is correct.

Q. And so it might not do any good if they've left it on the side of the barricade they were on?

A. There's a possibility, yes.

Q. Would have had more fact impact on them than the person inside?

A. Possibly, yes.

Q. And in order to get it over that bed frame and over the other barricaded materials, it would have required the officer, if he wanted to put it on the inside of the room, to throw it over the top of that, right?

A. Yes.

Q. And so once he did that, where exactly it ended up and landed there would be no way to control exactly, right?

A. Not exactly, no.

Q. There's no indication in the evidence that you looked at in this case, from reading all the reports and the depositions, that the officer that deployed that flash bang intended it to end up anywhere near Rudy Escobedo?

A. Correct.

Q. So the fact that it did is mere chance, right?

A. Yes.

(Trial Tr., Day 4, 54:21–61:10.) Defendant Zelt also testified about the deployment of flash bangs:

Q. Okay. Did you have a specific discussion with Lieutenant or Sergeant Selvia at that time about using a distraction device when they made entry?

A. I might have said, "Go ahead and use one," but I may not have also. That would be part of our training, and our experience. That would just be standard for any entry.

Q. Okay. And why is that? Why would you expect that Sergeant Selvia would already know that if he's going to take the team into a situation like this, he should use the distraction device, which sometimes, apparently, is referred to as a flash bang?

A. Well, Sergeant Selvia was a very experienced squad leader. And he recognizes the threat caused by what we call the fatal funnel, okay? And that is the most dangerous point on any entry is that doorway. And if we have a potentially-armed suspect inside, it's important we give ourselves some type of advantage, okay, before we go in to distract them. And knowing those, he would not have instructed team members to go through a door without first delivering a distraction device.

Q. And you said that's just a common practice from your training, the Emergency Services Team, they could expect to do that?

A. That is correct.

Q. And is this type of distraction device something commonly used many, many times before this day?

A. Probably close to a thousand times before then.

Q. Depending upon the situation, right?

A. That's correct.

(Trial Tr., Day 6, 174:14–175:16.) Defendant Zelt's testimony continued to put the use of flash bangs in context both generally and in this case:

> Q. Do you have any knowledge about whether or not such distraction devices or flash bangs are used by other departments in the State of Indiana and across the United States?
> A. Yes, through my position on the board of the Indiana S.W.A.T. Officers Association, I'm aware that the vast majority of teams throughout the State of Indiana, if not all of them, commonly would use these devices in similar situations, as well as across the country.
> Q. And you understood the team made entry into the apartment at that point?
> A. Yes, they did.
> Q. And eventually they went into the bedroom and you heard testimony that another flash bang was used in connection with the entry to the bedroom, right?
> A. That's correct.
> Q. Okay. Under the circumstances as you understood them to be with regard to a heavily-barricaded door, what would you expect your officers to do, consistent with their training and experience, before trying to enter a bedroom under such circumstances?
> A. They would most likely deliver a distraction device first.
> Q. Again, why?
> A. Because in that situation, especially, you've got it narrowed down. We were all familiar with the layout of the apartment and knew that Mr. Escobedo had to be within – behind that next door, either in the bedroom, bathroom or, you know, as it turned out to be, the closet. When you have a person who is inside there, you know they've got to be inside there, we don't know his status, whether he's alive or dead, or lying in wait. You don't know. It is certainly possible he could fire at the first people to come in the door. Because there's only one area we've got to come from, and he knows it and that's why we call it the fatal funnel. So the only advantage we can have, or the only thing that can give us a little bit of an edge is to use a distraction device to try to buy ourselves just a couple of seconds to get through that fatal funnel.

(Trial Tr., Day 6, 175:23–177:10.) This testimony, along with the exhibits it references, is distinguishable from the summary judgment record where the flash bang was seemingly tossed into Escobedo's bedroom blindly without a clear record about the fatal funnel and the rationale for how the police deployed the flash bang. Mr. Danaher's testimony that it was appropriate to

deploy the flash bang to allow the officers to make it safely through the fatal funnel, that its placement required the use of judgment, and that it had to be thrown over the barricade in order to be deployed in the bedroom is distinguishable from the summary judgment record where the expert's testimony could reasonably be inferred as requiring that "a flash bang grenade . . . be placed in a room, not thrown or tossed, so as to prevent it from landing in an unintended location." *Escobedo*, 600 F.3d at 785. The trial record supports the conclusion that Escobedo did not have a clearly established constitutional right on July 19, 2005, to be free from the use of flash bangs when he barricaded himself into the bedroom and created a fatal funnel that the police had to travel through before being able to reach him.

## CONCLUSION

On the basis of qualified immunity, the Court GRANTS the Defendants' Motion for Judgment as a Matter of Law [ECF No. 198] and DIRECTS the Clerk to enter judgment in favor of the Defendants pursuant to Federal Rule of Civil Procedure 50(b)(3).[6]

So ORDERED on May 27, 2011.

   s/ Theresa L. Springmann
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT

---

[6] The Jury Verdict [ECF No. 209] remains part of the record in this case and reflects the jury's findings on the issue of the Defendants' liability. The Court's grant of the Defendants' Motion and entry of judgment for the Defendants based on qualified immunity resolves a legal issue that the Court must address under Federal Rule of Civil Procedure 50 but does not disturb the Verdict.